EXAMINING BOARD OF ENGINEERS, ARCHI-
TECTS AND SURVEYORS ET AL. *v.*
FLORES DE OTERO

No. 74–1267.   Argued December 8, 1975—Decided June 17, 1976*

---

*Together with *Examining Board of Engineers, Architects and Surveyors et al.* v. *Perez Nogueiro,* also on appeal from the same court (see this Court's Rule 15 (3)).

574

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, and POWELL, JJ., joined. REHNQUIST, J., filed an opinion dissenting in part, *post*, p. 606. STEVENS, J., took no part in the consideration or decision of the case.

*Miriam Naveira De Rodon*, Solicitor General of Puerto Rico, argued the cause for appellants. With her on the brief was *Peter Ortiz*, Deputy Solicitor General.

*Max Ramirez de Arellano* argued the cause for appellees. With him on the brief was *Santos P. Amadeo*.†

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the issue whether the United States District Court for the District of Puerto Rico possesses

---

†*Solicitor General Bork, Assistant Attorney General Lee, Howard E. Shapiro,* and *David M. Cohen* filed a brief for the United States as *amicus curiae.*

jurisdiction, under 28 U. S. C. § 1343 (3),[1] to entertain a suit based upon 42 U. S. C. § 1983,[2] and, if the answer is in the affirmative, the further issue whether Puerto Rico's restriction, by statute, of licenses for civil engineers to United States citizens is constitutional. The first issue, phrased another way, is whether Puerto Rico is a "State," for purposes of § 1343 (3), insofar as that statute speaks of deprivation "under color of any State law"; the resolution of that question was reserved in *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663, 677 n. 11 (1974).

## I

A. Puerto Rico's Act of May 10, 1951, No. 399, as amended, now codified as P. R. Laws Ann., Tit. 20, §§ 681–710 (Supp. 1973), relates to the practice of engineering, architecture, and surveying. The administration and enforcement of the statute, by § 683, are committed to the Commonwealth's Board of Examiners of Engineers, Architects, and Surveyors, an appellant here.

---

[1] Title 28 U. S. C. § 1343 provides:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

.        .        .        .        .

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

[2] Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Section 689 [3] sets forth the qualifications "for registration as licensed engineer, architect or surveyor." For a "licensed engineer or architect," these qualifications in-

[3] The statute in pertinent part reads:

"§ 689. Qualifications for registration in the Board's registry

"As minimum evidence, satisfactory to the Board, to show that the applicant meets the qualifications for registration as licensed engineer, architect or surveyor, . . . the Board shall accept, as the case may be:

.          .          .          .          .

"(2) For licensed engineer or architect:

"(a) *Graduation, examination and minimum experience*. A certification accrediting his graduation from a course or curriculum of engineering or architecture, of a duration of not less than four (4) academic years or its equivalent, whose efficacy has been adequately verified, in any university, college or institute whose standing and proficiency are accepted by the Board; passing of written examinations (validation) on the fundamental subjects of engineering or architecture; and a detailed history of his professional experience of not less than four years, acquired after his graduation as a professional, satisfactory to the Board, and showing, in the judgment of the Board, that the applicant is qualified to practice as engineer or architect with a degree of professional responsibility which justifies his licensing. . . .

.          .          .          .          .

"[(3)] In addition to what has already been provided in this section, it shall be required that applicants for registration in the Board's registry be citizens of the United States of America and reside in the Commonwealth of Puerto Rico for not less than one year before filing their applications. Provided, that the requisite of being a citizen of the United States of America shall not apply to engineers, architects and surveyors who have studied the total courses and have received their corresponding grade or certificate in the Commonwealth of Puerto Rico provided that the approved course of study and institution where he has studied fulfill the qualifications fixed by sections 681–710 of this title, as the case may be; Provided, That the applicants shall meet all the qualifications fixed by this act for registration in the Board's registry.

"The requisites of residence and United States citizenship shall not apply to engineers, architects or surveyors whom the different agencies or instrumentalities of the Government of the Common-

clude a specified education, the passing of a written examination, and a stated minimum practical experience. The statute also requires that an applicant for registration be a citizen of the United States. It, however, exempts an otherwise qualified alien from the citizenship requirement if he has "studied the total courses" in the Commonwealth, or if he is employed by an agency or instrumentality of the government of the Commonwealth or by a municipal government or public corporation there; in the case of such employment, the alien receives a conditional license valid only during the time he is employed by the public entity.

B. Maria C. Flores de Otero is a native of Mexico and a legal resident of Puerto Rico. She is, by profession, a civil engineer. She is not a United States citizen. In June 1972 she applied to the Board for registration as a licensed engineer. It is undisputed that the applicant met all the specifications of formal education, examina-

---

wealth, the municipal governments and the public corporations employ or may wish to employ, it being understood that it shall not be necessary that the applicants be so employed at the time of their application or registration in the Board's registry. The applicants shall meet all the other qualifications fixed by sections 681–710 of this title for registration in the Board's registry.

"Upon compliance with these requirements by a noncitizen of the United States of America, the board shall issue a conditional certificate as graduate engineer, architect or surveyor or a conditional license as engineer, architect or surveyor, as the case may be, valid for the practicing of such professions only in the performance of their employment and during the time they are employed by the above-mentioned public entities . . . .

"Any engineer, architect or surveyor holding a conditional license or graduate engineer or architect with a conditional certificate who obtains the citizenship of the United States of America shall be entitled to apply for reregistration and be reregistered in the Board's registry as a graduate engineer or architect, or a licensed engineer or architect, or a licensed surveyor, as the case may be, in accordance with all the other requirements of the Board."

tion, and practice required for licensure, except that of United States citizenship. The Board denied her application until she furnished proof of that citizenship.

In October 1973 Flores instituted an action in the United States District Court for the District of Puerto Rico against the Board and its individual members. She asserted jurisdiction under 28 U. S. C. § 1343 (3),[4] and alleged that the citizenship requirement was violative of her rights under 42 U. S. C. §§ 1981 and 1983. A declaratory judgment and injunctive relief were requested.

In their answer to Flores' complaint, the defendants alleged that the United States District Court lacked jurisdiction to entertain the complaint, and that the provisions of § 689 did not contravene rights secured under the Fifth and Fourteenth Amendments or any rights guaranteed to Flores under the Constitution. They also alleged that Flores had adequate remedies available to her in the courts of Puerto Rico and that she had not exhausted those remedies. They requested that the court "abstain from assuming jurisdiction in this case and allow the Courts of the Commonwealth of Puerto Rico the opportunity to pass upon the issues raised by plaintiff." App. 5.

C. Sergio Perez Nogueiro is a native of Spain and a legal resident of Puerto Rico. He is, by profession, a civil engineer. He possesses degrees from universities in Spain and Colombia and from the University of Puerto Rico. He is not a United States citizen. He, like Flores, met all the specifications of formal education, examination, and practice required for licensure, except

---

[4] Federal-question jurisdiction under 28 U. S. C. § 1331 (a) was not asserted. The defendants, who are appellants here, acknowledge that they "are not here concerned with the general jurisdiction of the local [Federal] District Court under statutes such as 28 U. S. C. [§] 1331." Brief for Appellants 6.

that of United States citizenship. He is presently employed as an engineer by the Public Works Department of the municipality of Carolina, Puerto Rico, and holds a conditional license granted by the Board, as authorized by § 689, after he passed the required examination.[5]

In May 1974 Perez instituted an action against the Board[6] in the United States District Court for the District of Puerto Rico. He asserted that the citizenship requirement "is repugnant to the Due Process Clause of the Fifth or Fourteenth Amendments." App. 10. The complaint in all relevant respects was like that filed by Flores, and Perez, too, requested declaratory and injunctive relief, including a full and unconditional license to practice as an engineer in the Commonwealth.

D. A three-judge court was convened to hear Flores' case. It determined that it had jurisdiction under §§ 1983 and 1343. It concluded that abstention was unnecessary because § 689 was unambiguous and not susceptible of an interpretation that would obviate the need for reaching the constitutional question. On the merits, with one judge dissenting, it rejected the justifications proffered by the defendants for the citizenship requirement. It found that requirement unconsti-

---

[5] The certification given appellee Perez reads in part:
"That the approval of this examination grants him the right to practice ENGINEERING solely and exclusively as an employee of Agencies and instrumentalities of the Commonwealth of Puerto Rico, Municipal Governments and Public Corporations.

"I, FURTHER CERTIFY: That the limitation imposed on MR. SERGIO PEREZ NOGUEIRO right to practice *Engineering* are those required . . . because of his citizenship. MR. SERGIO PEREZ NOGUEIRO is entitled to be automatically registered as an ENGINEER without limitations as soon as he presents the Naturalization Certificate as American Citizen." App. 8–9.

[6] The complaint was later amended to include the individual members of the Board as parties defendant.

tutional and directed the defendants to license Flores as an engineer.

In a separate and subsequent judgment the same three-judge court, by the same vote, granted like relief to Perez. It decreed that he, too, be licensed as an engineer. Jurisdictional Statement 7a.

Appeals were taken by the defendants from both judgments, with a single jurisdictional statement pursuant to our Rule 15 (3). We noted probable jurisdiction and granted a stay of the execution and enforcement of the judgments. 421 U. S. 986 (1975).

## II

On the jurisdictional issue, the appellants do not contend that the United States Constitution has no application in Puerto Rico [7] or that claims cognizable under § 1983 may not be enforced there. Instead, they argue that unless a complainant establishes the $10,000 jurisdictional amount prescribed by 28 U. S. C. § 1331 (a),[8] a claim otherwise cognizable under § 1983 must be adjudicated in the courts of Puerto Rico.[9]

In approaching this question we are to examine the language of § 1343, the purposes of Congress in enacting it, "and the circumstances under which the words were employed." [10] *Puerto Rico v. Shell Co. (P. R.)*,

---

[7] At oral argument, the appellants conceded that the "Fourteenth Amendment or the Fifth Amendment is applicable to the people of Puerto Rico." Tr. of Oral Arg. 5.

[8] Title 28 U. S. C. § 1331 (a) provides:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

[9] Brief for Appellants 6, 9–10; Tr. of Oral Arg. 37.

[10] Using this approach, the Court has held (a) that the statutes of Puerto Rico *are not* "State" statutes for the purpose of our

*Ltd.,* 302 U. S. 253, 258 (1937); *District of Columbia* v. *Carter,* 409 U. S. 418, 420 (1973). As is so frequently the case, however, the language is not free of ambiguity, the purposes appear to be diverse and sometimes contradictory, and the circumstances are not fully spread upon the record for our instruction.

A. The federal civil rights legislation, with which we are here concerned, was enacted nearly 30 years before the conflict with Spain and the resulting establishment of the ties between Puerto Rico and the United States. Both § 1343 (3) and § 1983 have their origin in the Ku Klux Klan Act of April 20, 1871, § 1, 17 Stat. 13. That statute contained not only the substantive provision protecting against "the deprivation of any rights, privileges, or immunities secured by the Constitution" by any person acting under color of state law, but, as well, the jurisdictional provision authorizing a proceeding for the enforcement of those rights "to be prosecuted in the

---

appellate jurisdiction under 28 U. S. C. § 1254 (2), *Fornaris* v. *Ridge Tool Co.,* 400 U. S. 41, 42 n. 1 (1970), but (b) that the statutes of Puerto Rico *are* "State" statutes for the purpose of the three-judge court provision of 28 U. S. C. § 2281, *Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U. S. 663, 669–676 (1974). The first decision was based upon the Court's practice to construe narrowly statutes authorizing appeals, and Congress' failure to provide a statute, parallel to 28 U. S. C. § 1258, authorizing appeals from the Supreme Court of Puerto Rico under the same circumstances as appeals from the highest courts of the States. The second decision recognized the greater autonomy afforded Puerto Rico with its assumption of commonwealth status in the early 1950's. Inclusion of the statutes of Puerto Rico within 28 U. S. C. § 2281 served the purpose "of insulating a sovereign State's laws from interference by a single judge." 416 U. S., at 671. See also *Andres* v. *United States,* 333 U. S. 740, 745 (1948); *Puerto Rico* v. *Shell Co.* (*P. R.*), *Ltd.,* 302 U. S. 253, 257–259 (1937); and *Domenech* v. *National City Bank,* 294 U. S. 199, 204–205 (1935).

several district or circuit courts of the United States." [11] Jurisdiction was not independently defined; it was given simply to enforce the substantive rights created by the statute. The two aspects, seemingly, were deemed to coincide.

It has been said that the purpose of the legislation was to enforce the provisions of the Fourteenth, not the Thirteenth, Amendment. *District of Columbia* v. *Carter*, 409 U. S., at 423; *Lynch* v. *Household Finance Corp.*, 405 U. S. 538, 545 (1972); *Monroe* v. *Pape*, 365 U. S. 167, 171 (1961). As originally enacted, § 1 of the 1871 Act applied only to action under color of law of any "State." In 1874, however, Congress, presumably pursuant to its power to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," granted by the Constitution's Art. IV, § 3, cl. 2, added, without explanation, the words "or Territory" in the 1874 codification of United States statutes. Rev. Stat. § 1979 (1874). See *District of Columbia* v. *Carter*, 409 U. S., at 424 n. 11. The evident aim

---

[11] The first section of the 1871 Act provided:

"That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled 'An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication'; and the other remedial laws of the United States which are in their nature applicable in such cases."

was to insure that all persons residing in the Territories not be denied, by persons acting under color of territorial law, rights guaranteed them by the Constitution and laws of the United States.[12]

Although one might say that the purpose of Congress was evident, the method chosen to implement this aim was curious and, indeed, somewhat confusing. In the 1874 codification, only the substantive portion (the predecessor of today's § 1983) of § 1 of the 1871 Act was redesignated as § 1979.[13] It became separated from the jurisdictional portion (the predecessor of today's § 1343 (3)) which appeared as § 563 Twelfth and § 629 Sixteenth (concerning, respectively, the district courts and the circuit courts) of the Revised Statutes. But the words "or Territory" appeared only in § 1979; they did not appear in §§ 563 and 629.

Our question, then, is whether, in separately codifying the provisions and in having this discrepancy between them, Congress intended to restrict federal-court jurisdiction in some way. We conclude that it intended no such restriction. First, as stated above, the common origin of §§ 1983 and 1343 (3) in § 1 of the 1871 Act suggests that the two provisions were meant to be, and are, complementary. *Lynch* v. *Household Finance*

---

[12] Another change effected with the codification, and without explanation, was the addition in § 1979 of the words "and laws" following the words "the Constitution."

These changes were retained in § 1979 as it appeared in Rev. Stat. (1878).

[13] Section 1979 provided:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

*Corp.*, 405 U. S., at 543 n. 7. There is no indication that Congress intended to prevent federal district and circuit courts from exercising subject-matter jurisdiction of claims of deprivation of rights under color of territorial law if they otherwise had personal jurisdiction of the parties. Second, a contrary interpretation necessarily would lead to the conclusion that persons residing in a Territory were not effectively afforded a federal-court remedy there for a violation of the 1871 Act despite Congress' obvious intention to afford one. The then existing territorial district courts established by Congress were granted "the *same* jurisdiction, in all cases arising under the Constitution and laws of the United States, as is vested in the circuit and district courts of the United States." Rev. Stat. § 1910 (1874) (emphasis added).[14] Thus, if the federal district and circuit courts had jurisdiction to redress deprivations only under color of state (but not territorial) law, the territorial courts were likewise so limited. Further, the United States District Courts for the Districts of California and Oregon, and the territorial District Court for Washington possessed jurisdiction over violations of laws extended to the Territory of Alaska. Rev. Stat. § 1957 (1874). Unless the federal courts had jurisdiction to redress deprivations of rights by persons acting under color of territorial law,

---

[14] The then territorial courts were those in the Territories of New Mexico, Utah, Colorado, Dakota, Arizona, Idaho, Montana, and Wyoming. The Territory of Washington was governed by Rev. Stat. § 1911 (1874), which provided, in part, that its territorial district courts shall have "the same jurisdiction in all cases arising under the Constitution of the United States, and the laws of the Territory, as is vested in the circuit and district courts of the United States." It will be noted that the quoted language does not include the words "and laws" after "Constitution." Section 1910, in contrast, did. The omission was soon rectified, however. Rev. Stat. § 1911 (1878).

Congress' explicit extension of the 1871 Act to provide a remedy against persons acting under color of territorial law was only theoretical because no forum existed in which these rights might be enforced.

This conclusion that Congress granted territorial courts jurisdiction to enforce the provisions of § 1979 is strengthened by two additional factors. First, Congress explicitly provided: "The Constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within all the organized Territories, and in every Territory hereafter organized as elsewhere within the United States." Rev. Stat. § 1891 (1874). Section 1979, with its reference to Territories was obviously an applicable statute. Second, it was not until the following year that Congress conferred on United States district courts general federal-question jurisdiction.[15] Act of Mar. 3, 1875, § 1, 18 Stat. 470, now codified as 28 U. S. C. § 1331 (a). See generally *Zwickler* v. *Koota*, 389 U. S. 241, 245–247

---

[15] Original "arising under" jurisdiction was vested in the federal courts by the Act of Feb. 13, 1801, § 11, 2 Stat. 92, but was repealed a year later by the Act of Mar. 8, 1802, § 1, 2 Stat. 132. There was nothing further along this line until the Act of Mar. 3, 1875. See *District of Columbia* v. *Carter*, 409 U. S. 418, 427 n. 20 (1973).

Revised Stat. § 5600 (1874) provided:

"The arrangement and classification of the several sections of the revision have been made for the purpose of a more convenient and orderly arrangement of the same, and therefore no inference or presumption of a legislative construction is to be drawn by reason of the Title, under which any particular section is placed."

This provision lends some support to our conclusion that the failure to add the words "or Territory" to the jurisdictional successor of § 1 of the 1871 Act was mere legislative oversight. Had § 1 remained intact, the words "or Territory" would have been added to the substantive part of § 1 while the jurisdictional part would have continued to read "such proceeding to be prosecuted in the several district or circuit courts of the United States." 17 Stat. 13,

(1967). Accordingly, unless in 1874 the federal district and circuit courts had jurisdiction to redress deprivations under color of territorial law, Congress, although providing rights and remedies, could be said to have failed to provide a means for their enforcement.

For all these reasons, we conclude that the federal territorial as well as the federal district and circuit courts generally had jurisdiction to redress deprivations of constitutional rights by persons acting under color of territorial law. We turn, then, to the legislation specifically applicable to Puerto Rico.

B. A similar approach was taken by Congress in its establishment of the civil government in Puerto Rico in the exercise of its territorial power under Const., Art. IV, § 3, cl. 2.[16] By the Treaty of Paris, 30 Stat. 1754 (1899), Spain ceded Puerto Rico to the United States. 30 Stat. 1755. Shortly thereafter, the Foraker Act, being the Act of April 12, 1900, 31 Stat. 77, became law. This legislation established a civil government for Puerto

---

[16] The powers vested in Congress by Const., Art. IV, § 3, cl. 2, to govern Territories are broad. *District of Columbia* v. *Carter,* 409 U. S., at 430–431; *National Bank* v. *County of Yankton,* 101 U. S. 129, 133 (1880); *American Insurance Co.* v. *Canter,* 1 Pet. 511, 542 (1828). And in the case of Puerto Rico, the Treaty of Paris, 30 Stat. 1754 (1899), specifically provided: "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by Congress." *Id.,* at 1759. Congress exercised its powers fully. Thus, by the Foraker Act, 31 Stat. 77, the President was authorized to appoint, with the advice and consent of the Senate, the Governor of Puerto Rico, and its chief executive officers, *id.,* at 81; the justices of the Supreme Court of Puerto Rico, and the judge of the United States District Court there. *Id.,* at 84. In addition, Congress required that "all laws enacted by the [Puerto Rico] legislative assembly shall be reported to the Congress of the United States, which hereby reserves the power and authority, if deemed advisable, to annul the same." *Id.,* at 83.

Rico, including provisions for courts. The judicial structure so created consisted of a local court system with a Supreme Court, and, as well, of a Federal District Court.[17] The Act, § 34, 31 Stat. 84, provided: "The [federal] district court . . . shall have, in addition to the ordinary jurisdiction of district courts of the United States, jurisdiction of all cases cognizant in the circuit courts of the United States."[18]

On its face, this appears to have been a broad grant of jurisdiction similar to that conferred on the United States district courts and comparable to that conferred on the earlier territorial courts. The earlier territorial grants, however, were different. Whereas the Federal District Court for Puerto Rico was to have "the ordinary jurisdiction of district courts of the United States," the earlier territorial courts had been given explicitly, by Rev. Stat. § 1910 noted above, "the same jurisdiction, in all cases arising under the Constitution and laws of the United States, as is vested in the circuit and district courts of the United States." One might expect that

---

[17] This establishment of two separate systems of courts stands in contrast to other territorial legislation where only one system of courts, including district courts and a supreme court, was established and given the jurisdiction vested in United States courts. See Rev. Stat. §§ 1864–1869, 1910 (1874). See also *Palmore* v. *United States*, 411 U. S. 389, 402–403 (1973).

[18] Section 34 provided in relevant part:

"That Porto Rico shall constitute a judicial district to be called 'the district of Porto Rico.' The President, by and with the advice and consent of the Senate, shall appoint a district judge . . . for a term of four years, unless sooner removed by the President. The district court for said district shall be called the district court of the United States for Porto Rico . . . and shall have, in addition to the ordinary jurisdiction of district courts of the United States, jurisdiction of all cases cognizant in the circuit courts of the United States, and shall proceed therein in the same manner as a circuit court." 31 Stat. 84.

the grant of jurisdiction in the former necessarily encompassed or was the same as the grant of jurisdiction in the latter. Congress, however, was divided over the question whether the Constitution extended to Puerto Rico by its own force or whether Congress possessed the power to withhold from Puerto Ricans the constitutional guarantees available to all persons within the several States and the earlier Territories. See S. Rep. No. 249, 56th Cong., 1st Sess. (1900); H. R. Rep. No. 249, 56th Cong., 1st Sess. (1900).[19]

The division within Congress was reflected in the legislation governing Puerto Rico. Thus, despite some support for the measure, see S. Rep. No. 249, pp. 12–13, Congress declined to grant citizenship to the inhabitants of Puerto Rico. 33 Cong. Rec. 3690 (1900). And, in contrast to some earlier territorial legislation, Congress did not expressly extend to Puerto Rico the Constitution of the United States or impose on the statutes of Puerto Rico then in effect the condition that they be continued only if consistent with the United States Constitution.[20]

---

[19] The report of the majority of the House Committee considering the legislation for Puerto Rico concluded:

"First. That upon reason and authority the term 'United States,' as used in the Constitution, has reference only to the States that constitute the Federal Union and does not include Territories.

"Second. That the power of Congress with respect to legislation for the Territories is plenary." H. R. Rep. No. 249, 56th Cong., 1st Sess., 16 (1900).

But see the minority report, id., at 17–20. This adopts by reference the views of Representative Newlands: "The weight of authorities sustain[s] the proposition that the Constitution, ex proprio vigore, controls the action of the Government created by the Constitution wherever it operates, whether in States or Territories." Id., at 29.

[20] The Senate Committee considering the proposed legislation for a civil government in Puerto Rico surveyed the previous territorial legislation to determine when, and under what circumstances, the Congress had extended the Constitution to the Territories. It con-

At the same time, however, Congress undoubtedly was aware of the above-mentioned Rev. Stat. § 1891 providing: "The Constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect . . . in every Territory hereafter organized as elsewhere within the United States." Yet no mention of this statute was made in the Foraker Act. In contrast, two years later, Congress made § 1891 expressly inapplicable when it created a civil government for the Territory of the Philippines. Act of July 1, 1902, c. 1369, § 1, 32 Stat. 692.[21] Moreover, Congress, by § 14 of the Foraker Act, extended to Puerto Rico "the statutory laws [other than the internal revenue

---

cluded that, as a rule, the organization of a Territory had not been accompanied by an extension of the Constitution. Not until 1850, when Congress established a government for the Territory of New Mexico, did it explicitly provide: "That the Constitution, and all laws of the United States which are not locally inapplicable, shall have the same force and effect within the said Territory of New Mexico as elsewhere within the United States." Act of Sept. 9, 1850, c. 49, § 17, 9 Stat. 452. See S. Rep. No. 249, 56th Cong., 1st Sess., 6 (1900). This provision became the model for subsequent territorial legislation.

[21] "The provisions of section eighteen hundred and ninety-one of the Revised Statutes of eighteen hundred and seventy-eight shall not apply to the Philippine Islands." 32 Stat. 692. Nevertheless, the people of the Philippines were not left unprotected because Congress also provided them with a bill of rights guaranteeing most of the basic protections afforded by the Constitution to persons within the United States. § 5, 32 Stat. 692. See *Kepner* v. *United States,* 195 U. S. 100 (1904).

In *Downes* v. *Bidwell,* 182 U. S. 244 (1901), which presented this Court with its first opportunity to review the constitutionality of the Foraker Act, Mr. Justice Brown referred to Rev. Stat. § 1891 in his opinion but attached no significance to it. 182 U. S., at 257. In contrast, the Court in *Dorr* v. *United States,* 195 U. S. 138, 143 (1904), relied on the 1902 Act's express exclusion of § 1891, in holding that the Constitution, except insofar as required by its own terms, did not extend to the Philippines.

laws] of the United States not locally inapplicable," 31 Stat. 80,[22] and Rev. Stat. § 1979, providing remedies for deprivation of rights guaranteed by the Constitution and laws of the United States by persons acting under color of territorial law was at least potentially "applicable."

This review of the Foraker Act and its legislative history leads to several conclusions: Congress was uncertain of its own powers respecting Puerto Rico and of the extent to which the Constitution applied there. At the same time, it recognized, at least implicitly, that the ultimate resolution of these questions was the responsibility of this Court. S. Rep. No. 249, pp. 9–12; H. R. Rep. No. 249, pp. 9–15, 25–28. Thus Congress appears to have left the question of the personal rights to be accorded to the inhabitants of Puerto Rico to orderly development by this Court and to whatever further provision Congress itself might make for them. The grant of jurisdiction to the District Court in Puerto Rico, nevertheless, appeared to be sufficiently broad to permit redress of deprivations of those rights by persons acting under color of territorial law. See *Insular Police Comm'n* v. *Lopez*, 160 F. 2d 673, 676–677 (CA1), cert. denied, 331 U. S. 855 (1947). Nothing in the language of § 34 of the Foraker Act precluded the grant of ju-

---

[22] This provision was continued as § 9 of the Organic Act of 1917, 39 Stat. 954: "That the statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Porto Rico as in the United States, except the internal-revenue laws." This is now part of the Puerto Rican Federal Relations Act, 48 U. S. C. § 734. Although appellants contend that, for a variety of reasons, the federal statutes with which we are concerned should not apply to Puerto Rico, they do not argue that these statutes are "locally inapplicable," within the meaning of the Puerto Rican Federal Relations Act.

risdiction accorded the earlier territorial courts by Rev. Stat. § 1910, and its language, containing no limitations, cautions us against reading into it an exception not supported by persuasive evidence in the legislative history.

Subsequent legislation respecting Puerto Rico tends to support the conclusion that uncertainty over the application of the Constitution did not lead Congress to deprive the inhabitants of Puerto Rico of a federal forum for vindication of whatever rights did exist. In the Organic Act of 1917, sometimes known as the Jones Act, 39 Stat. 951, Congress made more explicit the jurisdiction of the Federal District Court by according it "jurisdiction of all cases cognizable in the district courts of the United States," § 41, 39 Stat. 965; generally granted Puerto Rico citizens United States citizenship, § 5, 39 Stat. 953; and codified for Puerto Rico a bill of rights, § 2, 39 Stat. 951. This bill of rights, which remained in effect until 1952, provided Puerto Ricans with nearly all the personal guarantees found in the United States Constitution.[23] The very first provision, for example, read: "That no law shall be enacted in Porto Rico which shall deprive any person of life, liberty, or property without due process of law, or deny to any person therein the equal protection of the laws." These words are almost identical with the language of the Fourteenth Amendment; and when Congress selected them, it must have done so with the Fourteenth Amendment

---

[23] Section 2 of the Jones Act, 39 Stat. 951, left only two major exceptions: the right, under the Fifth Amendment, not to "be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury," and the right, under the Sixth and Seventh Amendments, to a jury trial. See *Balzac* v. *Porto Rico*, 258 U. S. 298, 306 (1922); S. Rep. No. 1779, 81st Cong., 2d Sess., 2 (1950); H. R. Rep. No. 2275, 81st Cong., 2d Sess., 2 (1950).

in mind and with a view to further development by this Court of the doctrines embodied in it. See *Kepner* v. *United States,* 195 U. S. 100, 124 (1904). In its passage of the Jones Act, Congress clearly set the stage for the federal court in Puerto Rico to enforce the provisions of § 1983's predecessor (Rev. Stat. § 1979) which prohibited the deprivation "under color of any statute, ordinance, regulation, custom, or usage, of any . . . Territory . . . of any rights, privileges, or immunities secured by the Constitution and laws." See *Munoz* v. *Porto Rico Ry. Light & Power Co.,* 83 F. 2d 262, 264–266 (CA1), cert. denied, 298 U. S. 689 (1936).

The jurisdictional provision of the Act, referring to "all cases cognizable in the district courts of the United States," remained in effect until 1948. At that time Congress, in the course of a major revision of the Judicial Code, placed the nonterritorial jurisdiction of the District Court of Puerto Rico, as well as the District Court of Hawaii, squarely within Title 28 of the United States Code. It provided: "Puerto Rico constitutes one judicial district." Act of June 25, 1948, c. 646, § 119, 62 Stat. 889. The stated reason for this change was that "Hawaii and Puerto Rico are included as judicial districts of the United States, since in matters of jurisdiction, powers, and procedure, they are in all respects equal to other United States district courts." H. R. Rep. No. 308, 80th Cong., 1st Sess., 6 (1947). This confirms our conclusion that until the establishment of the Commonwealth, the Federal District Court in Puerto Rico had the same jurisdiction to enforce the provisions of 42 U. S. C. § 1983 as that conferred by 28 U. S. C. § 1343 (3) and its predecessor statutes on the United States district courts in the several States. See *Miranda* v. *United States,* 255 F. 2d 9 (CA1 1958); *Insular Police Comm'n* v. *Lopez, supra.*

Only two years later, Congress responded to demands

for greater autonomy [24] for Puerto Rico with the Act of July 3, 1950, c. 446, 64 Stat. 319. This legislation, offered in the "nature of a compact" to "the people of Puerto Rico," § 1, 48 U. S. C. § 731b, authorized them to draft their own constitution which, however, "shall provide a republican form of government and shall include a bill of rights," § 2, 48 U. S. C. § 731c. The proposed constitution thereafter submitted declared that it was drafted "within our union with the United States of America," and that among the "determining factors in our life" were considered "our citizenship of the United States of America" and "our loyalty to the principles of the Federal Constitution." Preamble of the Constitution of Puerto Rico, 1 P. R. Laws Ann. p. 207 (1965). See note following 48 U. S. C. § 731d. Congress approved the proposed constitution after adding, among other things, a condition that any amendment or revision of the document be consistent with "the applicable provisions of the Constitution of the United States." 66 Stat. 327.[25] The condition was accepted, the compact

---

[24] In 1947 Congress had given the qualified voters of Puerto Rico the right to select their own governor by popular suffrage. Act of Aug. 5, 1947, c. 490, 61 Stat. 770.

[25] The purpose of the condition was explained:

"Applicable provisions of the United States Constitution and the Federal Relations Act will have the same effect as the Constitution of the United States has with respect to State constitutions or State laws. United States laws not locally inapplicable will have equal force and effect in Puerto Rico as throughout the States except as otherwise provided in the Federal Relations Act. Any act of the Puerto Rican Legislature in conflict with . . . the Constitution of the United States or United States laws not locally inapplicable would be null and void.

"Within this framework, the people of Puerto Rico will exercise self-government. As regards local matters, the sphere of action and the methods of government bear a resemblance to that of any State of the Union." S. Rep. No. 1720, 82d Cong., 2d Sess., 6 (1952).

became effective, and Puerto Rico assumed "Commonwealth" status. This resulted in the repeal of numerous provisions of the Organic Act of 1917, including the bill of rights that Act contained. Act of July 3, 1950, c. 446, § 5, 64 Stat. 320. The remainder became known as the Puerto Rican Federal Relations Act. § 4, 64 Stat. 319.

The question then arises whether Congress, by entering into the compact, intended to repeal by implication the jurisdiction of the Federal District Court of Puerto Rico to enforce 42 U. S. C. § 1983. We think not. As was observed in *Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U. S., at 671, the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union, and accordingly, Puerto Rico "now 'elects its Governor and legislature; appoints its judges, all cabinet officials, and lesser officials in the executive branch; sets its own educational policies; determines its own budget; and amends its own civil and criminal code.' " See generally Leibowitz, The Applicability of Federal Law to the Commonwealth of Puerto Rico, 56 Geo. L. J. 219, 221 (1967); Magruder, The Commonwealth Status of Puerto Rico, 15 U. Pitt. L. Rev. 1 (1953); *Americana of Puerto Rico, Inc.* v. *Kaplus,* 368 F. 2d 431 (CA3 1966), cert. denied, 386 U. S. 943 (1967). More importantly, the provisions relating to the jurisdiction of a Federal District Court in Puerto Rico were left undisturbed, and there is no evidence in the legislative history that would support a determination that Congress intended such a departure.[26] In the

---

[26] Subsequent congressional legislation affecting the Federal District Court in Puerto Rico further confirms the conclusion that it possesses the same jurisdiction as that conferred on the federal district courts in the several States. By Pub. L. 89–571, 80 Stat. 764, the tenure of federal judges in Puerto Rico was made iden-

absence of a change in the language of the jurisdictional provision or of affirmative evidence in the legislative history, we are unwilling to read into the 1952 legislation a restriction of the jurisdiction of the Federal District Court.

C. Our conclusion not to attribute to Congress an inclination to leave the protection of federal rights exclusively to the local Puerto Rico courts is supported by *District of Columbia* v. *Carter,* 409 U. S. 418 (1973). There the Court held that the District was neither a State nor a Territory within the meaning of 42 U. S. C. § 1983. The District, it was observed, occupies a unique status within our system of government. It is the seat of the National Government, and, at the time the Civil Rights Act of 1871 was enacted, Congress exercised plenary power over its activities. These geographical and political considerations, as well as "the absence of any indication in the language, purposes, or history of § 1983 of a legislative intent to include the District within the scope of its coverage," supported the Court's conclusion. 409 U. S., at 432.

Appellants, however, focus upon the characterization of the District as *"sui generis* in our governmental structure," *ibid.,* and argue that because the Commonwealth of Puerto Rico is also *sui generis,* the conduct of persons acting under color of Commonwealth law is similarly

---

tical to that of other United States district judges. The reason given for this amendment was that the Federal District Court in Puerto Rico "is in its jurisdiction, powers, and responsibilities the same as the U. S. district courts in the [several] States." S. Rep. No. 1504, 89th Cong., 2d Sess., 2 (1966); see also H. R. Rep. No. 135, 89th Cong., 1st Sess., 2–3 (1965).

The complete identity of the responsibility of these courts was effectuated in 1970, 84 Stat. 298, when Congress repealed § 41 of the Act of Mar. 2, 1917, 39 Stat. 965, in the context of providing additional United States district judges throughout the United States, including Puerto Rico.

exempted from scrutiny under § 1983.[27] We readily concede that Puerto Rico occupies a relationship to the United States that has no parallel in our history, but we think that it does not follow that Congress intended to relinquish federal enforcement of § 1983 by restricting the jurisdiction of the Federal District Court in Puerto Rico. It was observed in *Carter*, 409 U. S., at 427, that Congress, in enacting the civil rights legislation with which we are concerned, recognized that it "had neither the means nor the authority to exert any direct control, on a day-to-day basis, over the actions of state officials," and that the "solution chosen was to involve the federal judiciary." Congress similarly lacked effective control over actions taken by territorial officials, although its authority to govern was plenary.[28] The same practical

---

[27] Appellants' argument rests in large part on *Palmore* v. *United States*, 411 U. S. 389 (1973), where, following the rationale of *Fornaris* v. *Ridge Tool Co.*, 400 U. S., at 42 n. 1, the Court held that a statute of the District of Columbia was not a state statute for the purposes of 28 U. S. C. § 1257 (2). *Palmore* does not suggest, however, that the District of Columbia and Puerto Rico are to be treated identically in every respect. Indeed, there is no reason to hold such a view, particularly in light of the fact that the sources of congressional authority with respect to them are entirely different.

[28] "It is true, of course, that Congress also possessed plenary power over the Territories. For practical reasons, however, effective federal control over the activities of territorial officials was virtually impossible. Indeed, 'the territories were not ruled immediately from Washington; in a day of poor roads and slow mails, it was unthinkable that they should be. Rather, Congress left municipal law to be developed largely by the territorial legislatures, within the framework of organic acts and subject to a retained power of veto. The scope of self-government exercised under these delegations was nearly as broad as that enjoyed by the States. . . .' *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 546 (1962) . . . . Thus, although the Constitution vested control over the Territories in the Congress, its practical control was both 'confused and ineffective,' making the problem of

limitations on Congress' effectiveness to protect the federally guaranteed rights of the inhabitants of Puerto Rico existed from the time of its cession and, after 1952, when Congress relinquished its control over the organization of the local affairs of the island and granted Puerto Rico a measure of autonomy comparable to that possessed by the States, the need for federal protection of federal rights was not thereby lessened. Finally, § 1983, by its terms, applies to Territories; Puerto Rico, but not the District of Columbia, obviously was one of these. Whether Puerto Rico is now considered a Territory or a State, for purposes of the specific question before us, makes little difference because each is included within § 1983 and, therefore, 28 U. S. C. § 1343 (3).

It follows that the United States District Court for the District of Puerto Rico has jurisdiction under 28 U. S. C. § 1343 (3) to enforce the provisions of 42 U. S. C. § 1983.

## III

Appellants, however, argue that the District Court should have abstained from reaching the merits of the constitutional claim. *Fornaris* v. *Ridge Tool Co.,* 400 U. S. 41 (1970), is cited as an example of abstention in a Puerto Rico context. We conclude that the District Court correctly determined that abstention was unnecessary. The case presents no novel question concerning the judicially created abstention doctrine; it requires, instead, only the application of settled principles reviewed just last Term in *Harris County Comm'rs Court* v. *Moore,* 420 U. S. 77 (1975).

Appellants urge that abstention was appropriate for

---

enforcement of civil rights in the Territories more similar to the problem as it existed in the States than in the District of Columbia." *District of Columbia* v. *Carter,* 409 U. S., at 430–431 (footnotes omitted).

two reasons. First, it is said that § 689 should be construed by the commonwealth courts in the light of § 1483 of the Civil Code, P. R. Laws Ann., Tit. 31, § 4124 (1968). This provision imposes liability on a contractor for defective construction of a building. We fail to see, however, how § 4124 in any way could affect the interpretation of § 689 which imposes, with the exceptions that have been noted, a requirement of citizenship for the licensing of an engineer.

Appellants' second argument is that the commonwealth courts should be permitted to adjudicate the validity of the citizenship requirement in the light of §§ 1 and 7 of Art. II of the Puerto Rico Constitution. 1 P. R. Laws Ann., Const., Art. II, §§ 1, 7 (1965). Section 1 provides: "No discrimination shall be made on account of race, color, sex, birth, social origin or condition, or political or religious ideas." Section 7 provides: "No person in Puerto Rico shall be denied the equal protection of the laws." These constitutional provisions are not so interrelated with § 689 that it may be said, as in *Harris County*, that the law of the Commonwealth is ambiguous. Rather, the abstention issue seems clearly controlled by *Wisconsin* v. *Constantineau*, 400 U. S. 433 (1971), where, as it was said in *Harris County*, 420 U. S., at 84–85, n. 8, "we declined to order abstention where the federal due process claim was not complicated by an unresolved state-law question, even though the plaintiffs might have sought relief under a similar provision of the state constitution." Indeed, to hold that abstention is required because § 689 might conflict with the cited broad and sweeping constitutional provisions, would convert abstention from an exception into a general rule.[29]

---

[29] During oral argument appellants seemed to suggest, for the first time, that § 689 was ambiguous. Tr. of Oral Arg. 9, 36. This argument is directed to the exception in § 689 for aliens "who have

## IV

This takes us, then, to the particular Puerto Rico statute before us. Does Puerto Rico's prohibition against an alien's engaging in the private practice of engineering deprive the appellee aliens of "any rights, privileges, or immunities secured by the Constitution and laws," within the meaning of 42 U. S. C. § 1983?

A. The Court's decisions respecting the rights of the inhabitants of Puerto Rico have been neither unambiguous nor exactly uniform. The nature of this country's relationship to Puerto Rico was vigorously debated within the Court as well as within the Congress.[30]  See

---

studied the total courses and have received their corresponding grade or certificate in the Commonwealth." The argument appears not to have been presented to the District Court. We conclude, also, that, for purposes of the present case, it is plainly without merit.

[30] In a series of decisions that have come to be known as the *Insular Cases*, the Court created the doctrine of incorporated and unincorporated Territories, *e. g., De Lima* v. *Bidwell*, 182 U. S. 1 (1901); *Dooley* v. *United States*, 182 U. S. 222 (1901); *Armstrong* v. *United States*, 182 U. S. 243 (1901); *Downes* v. *Bidwell*, 182 U. S. 244 (1901). The former category encompassed those Territories destined for statehood from the time of acquisition, and the Constitution was applied to them with full force. See, *e. g., Rassmussen* v. *United States*, 197 U. S. 516 (1905); but see *Hawaii* v. *Mankichi*, 190 U. S. 197 (1903). The latter category included those Territories not possessing that anticipation of statehood. As to them, only "fundamental" constitutional rights were guaranteed to the inhabitants. Although the question whether certain rights were or were not fundamental continued to provoke debate among the Members of the Court, it was clear that the Constitution was held not to extend *ex proprio vigore* to the inhabitants of Puerto Rico.

The most significant of the *Insular Cases* is *Downes* v. *Bidwell*, *supra*, where the Court held that the imposition by Congress of special duties on Puerto Rican goods did not violate the requirement of Const., Art. I, § 8, cl. 1, that "all Duties, Imposts and Excises shall be uniform throughout the United States."

The division of opinion in the Congress over how, and to what extent, the Constitution applied to Puerto Rico was reflected in the

Coudert, The Evolution of the Doctrine of Territorial Incorporation, 26 Col. L. Rev. 823 (1926). It is clear now, however, that the protections accorded by either the Due Process Clause of the Fifth Amendment or the Due Process and Equal Protection Clauses of the Fourteenth Amendment apply to residents of Puerto Rico. The Court recognized the applicability of these guarantees as long ago as its decisions in *Downes* v. *Bidwell,* 182 U. S. 244, 283–284 (1901), and *Balzac* v. *Porto Rico,* 258 U. S. 298, 312–313 (1922). The principle was reaffirmed and strengthened in *Reid* v. *Covert,* 354 U. S. 1 (1957),[31] and then again in *Calero-Toledo,*

---

Court's opinions in *Downes.* Mr. Justice Brown believed that the question was whether Congress had extended the Constitution to Puerto Rico; Mr. Justice White, with whom Justices McKenna and Shiras joined, propounded the theory of incorporated and unincorporated Territories; and Mr. Justice Gray was of the opinion that the question was essentially a political one to be left to the political branches of government. The Chief Justice, with whom Justices Harlan, Brewer, and Peckham joined, dissented on the ground that the Constitution applied to Puerto Rico *ex proprio vigore.* Mr. Justice White's approach in *Downes* v. *Bidwell* was eventually adopted by a unanimous Court in *Balzac* v. *Porto Rico,* 258 U. S., at 312–313.

Nor does it appear that the debate over the relationship of Puerto Rico to the United States has ended even now. See Note, Inventive Statesmanship vs. The Territorial Clause: The Constitutionality of Agreements Limiting Territorial Powers, 60 Va. L. Rev. 1041 (1974).

[31] The *Insular Cases* served as precedent for holdings that a civilian dependent of an American serviceman stationed abroad could be tried by an American court-martial for offenses committed in a foreign country. *Kinsella* v. *Krueger,* 351 U. S. 470 (1956); *Reid* v. *Covert,* 351 U. S. 487 (1956). The announcement in those cases that the Constitution applied with full force only in the States composing the Union and in incorporated Territories was overruled, however, only a year later when the Court granted petitions for rehearing, arrived at the opposite result, and withdrew the earlier opinions. *Reid* v. *Covert,* 354 U. S. 1 (1957).

416 U. S. 663 (1974), where we held that inhabitants of Puerto Rico are protected, under either the Fifth Amendment or the Fourteenth, from the official taking of property without due process of law.

The Court, however, thus far has declined to say whether it is the Fifth Amendment or the Fourteenth which provides the protection.[32] *Calero-Toledo*, 416 U. S., at 668–669, n. 5. Once again, we need not resolve that precise question because, irrespective of which Amendment applies, the statutory restriction on the ability of aliens to engage in the otherwise lawful private practice of civil engineering is plainly unconstitutional. If the Fourteenth Amendment is applicable, the Equal Protection Clause nullifies the statutory exclusion. If, on the other hand, it is the Fifth Amendment and its Due Process Clause that apply, the statute's discrimination is so egregious that it falls within the rule of *Bolling* v. *Sharpe,* 347 U. S. 497, 499 (1954).[33] See also *Schneider* v. *Rusk,* 377 U. S. 163, 168 (1964).

B. In examining the validity of Puerto Rico's virtually complete ban on the private practice of civil engineering by aliens, we apply the standards of our recent decisions in *Graham* v. *Richardson,* 403 U. S. 365 (1971); *Sugar-*

---

[32] The United States Court of Appeals for the First Circuit, of which Puerto Rico is a part, 28 U. S. C. § 41, similarly has declined to make that determination. *E. g., Colon-Rosich* v. *Puerto Rico,* 256 F. 2d 393, 397 (1958); *Stagg, Mather & Hough* v. *Descartes,* 244 F. 2d 578, 583 (1957); *Mora* v. *Mejias,* 206 F. 2d 377, 382 (1953).

[33] "[T]he concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. The 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' and, therefore, we do not imply that the two are always interchangeable phrases. But, as this Court has recognized, discrimination may be so unjustifiable as to be violative of due process." 347 U. S., at 499.

*man* v. *Dougall,* 413 U. S. 634 (1973) ; and *In re Griffiths,* 413 U. S. 717 (1973). These cases establish that state classifications based on alienage are subject to "strict judicial scrutiny." *Graham* v. *Richardson,* 403 U. S., at 376. Statutes containing classifications of this kind will be upheld only if the State or Territory imposing them is able to satisfy the burden of demonstrating "that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary . . . to the accomplishment' of its purpose or the safeguarding of its interest." *In re Griffiths,* 413 U. S., at 721–722 (footnotes omitted). These principles are applicable to the Puerto Rico statute now under consideration.

The underpinnings of the Court's constitutional decisions defining the circumstances under which state and local governments may favor citizens of this country by denying lawfully admitted aliens equal rights and opportunities have been two. The first, based squarely on the concepts embodied in the Equal Protection Clause of the Fourteenth Amendment and in the Due Process Clause of the Fifth Amendment, recognizes that "[a]liens as a class are a prime example of a 'discrete and insular' minority . . . for whom . . . heightened judicial solicitude is appropriate." *Graham* v. *Richardson,* 403 U. S., at 372. See also *San Antonio School Dist.* v. *Rodriguez,* 411 U. S. 1, 29 (1973) ; *Sugarman* v. *Dougall,* 413 U. S., at 642. The second, grounded in the Supremacy Clause, Const., Art. VI, cl. 2, and in the naturalization power, Art. I, § 8, cl. 4, recognizes the Federal Government's primary responsibility in the field of immigration and naturalization. See, *e. g., Hines* v. *Davidowitz,* 312 U. S. 52, 66 (1941) ; *Truax* v. *Raich,* 239 U. S. 33, 42 (1915). See also *Graham* v. *Richardson,* 403 U. S., at 378; *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410, 419 (1948).

Official discrimination against lawfully admitted aliens traditionally has taken several forms. Aliens have been prohibited from enjoying public resources or receiving public benefits on the same basis as citizens. See *Graham* v. *Richardson, supra; Takahashi* v. *Fish & Game Comm'n, supra.* Aliens have been excluded from public employment. *Sugarman* v. *Dougall, supra.* See M. Konvitz, The Alien and the Asiatic in American Law, c. 6 (1946). And aliens have been restricted from engaging in private enterprises and occupations that are otherwise lawful. See *In re Griffiths, supra; Truax* v. *Raich, supra; Yick Wo* v. *Hopkins,* 118 U. S. 356, 369 (1886).[34]

The present Puerto Rico statute, of course, falls into the last category. It is with respect to this kind of discrimination that the States have had the greatest difficulty in persuading this Court that their interests are substantial and constitutionally permissible, and that the discrimination is necessary for the safeguarding of those interests. Thus, in *Yick Wo* v. *Hopkins* the Court struck down an ordinance that was administered so as to exclude aliens from pursuing the lawful occupation of a laundry. In *Truax* v. *Raich* the Court invalidated a state statute that required a private employer, having five or more workers, to employ at least 80% qualified electors or native-born citizens. And in *In re Griffiths* a state statutory requirement prescribing United States citizenship as a condition for engaging in the practice of law was held unconstitutional. But see *Ohio ex rel. Clarke* v. *Deckebach,* 274 U. S. 392 (1927).

---

[34] States also have placed restrictions on the devolution of real property to aliens, see *Hauenstein* v. *Lynham,* 100 U. S. 483 (1880); *Blythe* v. *Hinckley,* 180 U. S. 333 (1901), and have denied them equal rights and opportunities to acquire and own land, see *Terrace* v. *Thompson,* 263 U. S. 197 (1923); *Oyama* v. *California,* 332 U. S. 633 (1948).

The reason for this solicitude with respect to an alien's engaging in an otherwise lawful occupation is apparent:

> "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure. If this could be refused solely upon the ground of race or nationality, the prohibition of the denial to any person of the equal protection of the laws would be a barren form of words." *Truax* v. *Raich,* 239 U. S., at 41 (citations omitted).

It is true that in *Truax* the Court drew a distinction between discrimination against aliens in private lawful occupations and discrimination against them where, it might be said, the State has a special interest in affording protection to its own citizens. *Id.,* at 39–40. That distinction, however, is no longer so sharp as it then was. Recently the Court has taken a more restrictive view of the powers of a State to discriminate against noncitizens with respect to public employment, compare *Crane* v. *New York,* 239 U. S. 195 (1915), aff'g *People* v. *Crane,* 214 N. Y. 154, 108 N. E. 427, and *Heim* v. *McCall,* 239 U. S. 175 (1915), with *Sugarman* v. *Dougall, supra;* and with respect to the distribution of public funds and the allocation of public resources, compare *McCready* v. *Virginia,* 94 U. S. 391 (1877), and *Patsone* v. *Pennsylvania,* 232 U. S. 138 (1914), with *Graham* v. *Richardson, supra,* and *Takahashi* v. *Fish & Game Comm'n, supra.*

We do not suggest, however, that a State, Territory, or local government, or certainly the Federal Government, may not be permitted some discretion in determining the circumstances under which it will employ aliens or whether aliens may receive public benefits or partake

of public resources on the same basis as citizens. In each case, the governmental interest claimed to justify the discrimination is to be carefully examined in order to determine whether that interest is legitimate and substantial, and inquiry must be made whether the means adopted to achieve the goal are necessary and precisely drawn.

In the present case the appellants have offered three justifications for Puerto Rico's almost total ban on aliens' engaging in the private practice of engineering: The first is to prevent the "uncontrolled" influx of Spanish-speaking aliens into the field in Puerto Rico. The second is to raise the prevailing low standard of living. The third is to provide the client of a civil engineer an assurance of financial accountability if a building for which the engineer is responsible collapses within 10 years of construction. P. R. Laws Ann., Tit., 31, § 4124 (1968).

The first justification amounts to little more than an assertion that discrimination may be justified by a desire to discriminate. This interest is unpersuasive on its face. It is also at odds with the Federal Government's primary power and responsibility for the regulation of immigration. Once an alien is lawfully admitted, a State may not justify the restriction of the alien's liberty on the ground that it wishes to control the impact or effect of federal immigration laws. Cf. *DeCanas* v. *Bica,* 424 U. S. 351 (1976).

Although the second broad justification proffered by the appellants has elements of substance and legitimacy, the means drawn to achieve the end are neither necessary nor precise. What the Commonwealth has done by its statute is to require private employers and contractors to hire only engineers who are American citizens. This end was held impermissible over 50 years ago in *Truax* v. *Raich, supra.* To uphold the statute on the basis of broad economic justification of this kind would permit

any State to bar the employment of aliens in any or all lawful occupations.

Finally, the asserted purpose to assure responsibility for negligent workmanship sweeps too broadly. United States citizenship is not a guarantee that a civil engineer will continue to reside in Puerto Rico or even in the United States, and it bears no particular or rational relationship to skill, competence, or financial responsibility. See *Sugarman* v. *Dougall,* 413 U. S., at 645; *In re Griffiths,* 413 U. S., at 724. Puerto Rico has available to it other ample tools to achieve the goal of an engineer's financial responsibility without indiscriminately prohibiting the private practice of civil engineering by a class of otherwise qualified professionals.

The judgments of the District Court are affirmed.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE REHNQUIST, dissenting in part.

I agree with the Court's conclusion that the United States District Court for the District of Puerto Rico had jurisdiction of appellees' claim under 28 U. S. C. § 1343 (3), and that it was not obligated to abstain from reaching the merits of that claim. I believe that I have some understanding of the difficulties which the Court necessarily encounters in then determining whether either the Fifth Amendment or the Fourteenth Amendment to the United States Constitution applies to Puerto Rico. But without attempting to recapitulate the doctrine of the cases from *Downes* v. *Bidwell,* 182 U. S. 244 (1901), to *Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U. S. 663 (1974), I do not think the inquiry lends itself to the facile "either-or" answer upon which the Court ultimately settles.

The Fourteenth Amendment is by its terms applicable to States: Puerto Rico is not a State. Doubtless constitutional inquiries shrouded as this one is in both history and case law cannot be definitively answered so simply as this, but I would be inclined to reject the claim that the Fourteenth Amendment is applicable to Puerto Rico until a case sufficiently strong to overcome this "plain meaning" obstacle, found in the language of the Amendment itself, is made out.*

The Fifth Amendment, of course, applies to Congress, and had this statute been enacted by Congress it would be subject to the strictures of the Fifth Amendment. But just as certainly it was not enacted by Congress, but by the Legislature of Puerto Rico. I could perhaps understand in this regard a theory that under the Foraker Act, which reserved to Congress the right to annul laws of the Puerto Rican Legislature with which it disagreed, see *ante,* at 586 n. 16, that legislature should be treated as the delegate of Congress equally subject to the strictures of the Fifth Amendment. But any such theory would, of course, face very substantial obstacles in view of the fact that Congress subsequently provided in the Organic Act of 1917 a bill of rights, giving Puerto Ricans *"nearly all* the personal guarantees found in the United States Constitution." *Ante,* at 591 (emphasis supplied).

If the constitutional limitations expressly directed to Congress, such as the Fifth Amendment, also directly restrict the Puerto Rican Legislature by virtue of its being a delegate of Congress, it would not only have been superfluous for Congress to provide an additional bill of

---

*The wording of the Thirteenth Amendment shows that the Framers of the post-Civil War Amendments knew how to word those provisions where it was intended that their guarantees have application in all Territories of the United States rather than just as a limit upon the authority of *state* government.

rights; it would have been quite impossible for it to endow its delegate with more power to disregard individual liberties than it itself may possess. I would thus find it extremely difficult to see how constitutional limitations upon the power of Congress may be thought to apply *ex proprio vigore* to the power of the Puerto Rican Legislature. Moreover, following the passage of the Act of July 3, 1950, and Puerto Rico's acceptance of Commonwealth status, see *ante,* at 593–594, I would have thought that the only restrictions upon the elected Legislature of Puerto Rico were those embodied in the Constitution enacted as a condition of assuming that status or directly imposed by Congress by statute.

In short, I am not nearly as certain as the Court appears to be that either the Fifth Amendment or the Fourteenth Amendment must govern the acts of the Legislature of Puerto Rico. It seems to me it is quite possible that neither provision operates as a direct limitation upon the authority of that elected body. Even if I am wrong in this, I would not have thought it as easy as does the Court to avoid more focused inquiry in this case into which provision may be applicable. For even if a State could not, consistent with the Equal Protection Clause of the Fourteenth Amendment, pass the statute challenged by appellees, it surely does not follow that the Fifth Amendment's due process limitation upon the exercise of federal authority requires an identical conclusion. See *Hampton* v. *Mow Sun Wong, ante,* at 100–101. For if for some reason it were to be concluded that the restrictions placed upon the Federal Government were somehow directly applicable to the actions of appellants, it would seem that they would be able equivalently to assert whatever additional authority that Government possesses with regard to aliens. Indeed, rejection of this approach would raise an even more

difficult question: Why should a restriction upon the authority of the Government of the United States, which may be thought of as granting concomitant rights to *United States citizens,* have any bearing upon how the people of a Territory' of the United States may deal with *aliens* within their Territory?

If the answers to these questions were dispositive of my vote in this case, I would feel compelled to explore them in much more detail than does the Court today. But even if I were to conclude that one part of the Court's either/or assumption was correct, I could not agree with the result which it believes is compelled by that assumption. I do not agree either that the statute in question violates the Equal Protection Clause of the Fourteenth Amendment, for the reasons stated in my dissent in *Sugarman* v. *Dougall,* 413 U. S. 634, 649 (1973), or that if the statute were subject to the limitations of the Fifth Amendment, it is infirm by reason of their application. *Hampton* v. *Mow Sun Wong, ante,* p. 117 (REHNQUIST, J., dissenting). I would therefore reverse the decision of the District Court.