PARTIDO NUEVO PROGRESISTA, Rafael Rodriguez Aguaya Miguel Tirado and Luis Rodriguez Suarez, Plaintiffs,

v.

GERINELDO BARRETO PEREZ, Administrator, Puerto Rico Elections Commission, Defendant,

Partido Popular Democratico, Intervenor.

Civ. No. 80–2420.

United States District Court, D. Puerto Rico.

Dec. 24, 1980.

Héctor M. Laffitte, Giselle López Bajandas, Enrique Bray, Héctor Reichard, Jr., Hato Rey, P. R., for plaintiffs.

Miguel Pagán, San Juan, P. R., for defendant.

Lino J. Saldaña, Santurce, P. R., for intervenor.

## OPINION AND ORDER

TORRUELLA, District Judge.

This controversy arises as a by-product of the general elections held in Puerto Rico on November 4, 1980 which resulted in the closest political contest in the Commonwealth's history.

Out of approximately 1,700,000 voters who cast their ballots for the four contending parties (the New Progressive Party, NPP; the Popular Democratic Party, PDP; the Puerto Rican Independence Party, PIP; and the Puerto Rican Socialist Party, PSP), the gubernatorial race was won by the NPP contender over the PDP candidate by 3,503 votes, which is less than .5% of the total votes cast.[1] The mayoral outcome in several of the municipal elections is also hotly contested, with the results being decided by very few votes: Juana Díaz (14 votes), Trujillo Alto (15 votes), Aguas Buenas (5 votes), Barranquitas (28 votes).

This contest is even more dramatic in House of Representatives District 35 (which is comprised of the Municipalities of Fajardo, Vieques, Culebra, Río Grande, Luquillo and Precinct 102 of Ceiba). In this District the NPP leads the PDP by 5 votes, out of a total of approximately[2] 48,392 votes cast.

Whichever of these two parties wins District 35, it will also win control of the House of Representatives, by one seat. The PDP has already won control of the Senate, 15 seats to the PNP's 12 seats.

Against this stimulating background we come to the controversy in the present case.

Article 1.033(b) of the Electoral Law of Puerto Rico, which has been in effect since December 20, 1977, codified at 16 L.P.R.A. § 3033(b), states as follows:

> "The rules adopted by the Commission to implement any of the voting systems deemed suitable shall provide for secret ballot, and shall not unduly favor or hinder any political party or candidate, nor produce onerous conditions for any elector or group of electors. Also, *if the handwritten ballot is used, it must guarantee that the elector may vote by making any affirmative mark in the space under the printed insignia or device of the party, or within the square in which a candidate's name appears. Any mark placed outside of said space or square shall be null and void, and deemed unmarked.*" (Emphasis supplied).

The Procedure Manual for Election Officials ("Manual de Procedimientos Para Funcionarios de Colegio y Coordinadores de Unidad Electoral") prepared by the Election Commission, which is composed of one commissioner from each party as well as the General Administration of Elections, states in Section 32 thereof as follows:

> "Any mark of those considered as valid (except for names or initials) that appear in the blank spaces of the write-in column, or *in other spaces outside of the columns of the parties shall be deemed as not having been made.*" (Translation and emphasis supplied).

Other language in that section of the Manual states as follows:

> being completed by the Puerto Rico Electoral Commission. At present the PNP's lead in District 35 is being challenged on various grounds before the administrative processes of the Commission for reasons unrelated to this case. It is likely that those challenges will end up before the Supreme Court of Puerto Rico.

---

**1.** Carlos Romero Barceló (NPP), 759,540; Rafael Hernández Colón (PDP), 756,037; Rubén Berríos Martínez (PIP) 87,238; Luis Lausel Hernández (PSP), 5,241.

**2.** It should be noted that in this District, as throughout Puerto Rico because of the close outcome of the election, a general recount is

"We shall consider valid marks any cross (X), check mark (✓), dot (.), dash mark (_), circle (o) or variations of those marks that are clearly distinguishable which reflect the voter's intention.

Any valid mark which is inside the column of the party in the area which corresponds to the party's insignia, whether this mark be: below, over, on the side or on the party insignia shall be considered a vote in favor of all the candidates of this party in the corresponding precinct . . .

To determine the intention of the voter when the marks touch other columns or other candidates within the column or of a different party, the following criteria shall be taken into account:

If the marks are a cross (X) which might touch or pass onto another column, the point of intersection of the two lines shall determine the intention of the voter. The same will be done if a check mark (✓) is involved which touches or crosses into another column: the point where the two lines touch will be taken as signifying the voter's intention. In the event of marks that are made with a dash (_), the starting point of the line will be used to determine the intention, if this is clearly distinguishable." (Translation ours).

Throughout this Manual there are also various examples of marked ballots, all of which indicate the marking inside the ballot squares.

We also take notice of the fact that throughout the pre-election period the Electoral Commission and the various parties carried out massive, Island-wide voter education programs in the various news media in which the proper method of voting was duly explained and emphasized. In fact,

one of the parties here in contention, the PDP, has had as its major party slogan since 1940: "Una sola cruz *debajo* de la pava"—"One cross only *beneath* the straw-hat."[3] (Translation and emphasis ours).

As things would have it however, somewhere between 500 and 1000 voters throughout Puerto Rico marked their ballots outside "the space under the printed insignia or device of the party" or outside "the square in which a candidate's name appears."[4] Although the exact number is not presently known[5] there is no question that a number of these disputed ballots were cast in Juana Díaz, Trujillo Alto, Aguas Buenas, Barranquitas, and Representative District 35. Furthermore we harbor no doubts but that these disputed votes almost exclusively favor the PDP and are in sufficient numbers to decide the final outcome of those elections.

On November 14, 1980, Gerineldo Barreto Pérez, the Administrator of the Puerto Rico Election Commission, ruled that pursuant to Article 1.033(b) of the Electoral Law, supra, the ballots in question were null and void. This ruling was appealed by the PDP to the Electoral Review Board where it was upheld on November 17, 1980. Thereafter the PDP sought review before the Supreme Court of Puerto Rico. The NPP intervened in the proceeding before the Supreme Court, the consequences of which we shall presently discuss in further detail. On December 2, 1980 the Supreme Court reversed the Electoral Review Board and ordered the validation and counting of these ballots (Case Number 0–80–646, reported at 108 D.P.R. —— (1980).

On December 4, 1980 the complaint was filed in this case. The Plaintiffs are the

---

3. The straw "jibaro" hat on a "jibaro" (the hill-dwellers of Puerto Rico) has been the PDP symbol since its founding days.

4. See Appendix A for an example of the typical ballot in question.

5. In Precincts 1 through part of 68 (which is Juana Díaz), the Electoral Commission considered these ballots as void, and as such, included them within the count of other void ballots without accounting for them in a sepa-

rate category. Partway through the recount of Precinct 68, the Supreme Court of Puerto Rico reversed the Electoral Commission's ruling, as we shall discuss in the body of this opinion, and thereafter these ballots were included and counted as valid votes, again without a separate accounting being officially kept by the Commission. Our findings on this issue are based on the testimony and evidence of the party officials who did keep a log.

NPP, Miguel Tirado González, as a resident of Carolina who voted in that municipality, Luis Rodríguez Suárez also a Carolina voter, and Rafael Rodríguez Aguayo, a San Juan voter-resident. Tirado González is Undersecretary of the NPP and Rodríguez Aguayo is its General Secretary. The Defendant is Gerineldo Barreto Pérez, who as previously indicated, is the Administrator of the Elections Commission. Claiming violation of Federal constitutional rights under the First, Fifth and Fourteenth Amendments of the Constitution, and invoking the protection of the Civil Rights Act, 42 U.S.C. § 1983, Plaintiffs seek a declaratory judgment and injunctive relief to prevent Defendant from counting the questioned ballots.

This Court ordered Plaintiffs to notify all other political parties of the filing of this action, and on December 17, 1980 the PDP intervened herein and filed an answer. The PIP and PSP have not entered an appearance herein.

On December 18 and 19, 1980 a consolidated hearing on preliminary and permanent injunction [6] was held with the full participation of all parties hereto.

### JURISDICTION, RES JUDICATA, PRIVITY AND STANDING

Intervenor PDP has challenged the jurisdiction of this Court, alleging that the Supreme Court of Puerto Rico has the exclusive jurisdiction to determine the validity of the votes in question pursuant to its interpretation of the Laws of Puerto Rico, and that any appeal from such a decision can be made only to the Supreme Court of the United States within the limited range provided by 28 U.S.C. § 1258. The PDP also claims that since the NPP intervened in the Supreme Court review, the NPP and all persons in privity (which allegedly includes individual Plaintiffs all of whom are NPP officers and/or members) are bound and prevented by the principles of *res judicata* and collateral estoppel from challenging said decision in this Court. Finally, Intervenor questions the standing of the individual Plaintiffs to challenge the counting of the questioned ballots in any precinct other than that in which they cast their ballot in the November 4, 1980 elections.

All of these questions are closely intertwined.

■ The jurisdiction of this Court is clearly established by 42 U.S.C. § 1983 and its procedural counterparts in 28 U.S.C. 1343(a)(3) and (4). *Examining Board of Engineers, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); *Griffin v. Burns*, 570 F.2d 1065, 1070 (C.A.1, 1978).

42 U.S.C. 1983 reads in its pertinent part as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

28 U.S.C. 1343(a)(3) and (4) in their pertinent parts state:

... "(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

... (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for

---

6. This action was taken by the Court by reason of the obvious urgency of this matter, in that the Constitution of Puerto Rico provides that the term of office for the Governor, and for Senators and Representatives begins on the second day of January of the year following the election, i. e. in this case on January 2, 1981.

P.R.Const. Art. IV Sec. 2 (Governor); Art. III Sec. 8 (Senators and Representatives). The Municipal Law, 21 L.P.R.A. Sec. 1101 *et seq.*, provides that the municipal assemblies shall hold their inaugural session on the second Monday of January following the general elections. 21 L.P.R.A. § 1156.

equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

There is no question but that Plaintiffs' allegations fall within the purview of 42 U.S.C. § 1983 and 28 U.S.C. § 1343(a)(3) and (4) and thus the Court has jurisdiction to hear this action. Whether a cause of action has been proven, is a closer question which will be discussed in detail, but which does not affect our power to entertain and decide the subject matter of these allegations. *Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 930 (1946); *Brule v. Southworth*, 611 F.2d 406 (C.A.1, 1979).

 From the record of the case before the Supreme Court of Puerto Rico it appears that in the NPP's Motion for Intervention, said party specifically reserved its Federal constitutional and statutory rights pursuant to *England v. Board of Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). This reservation also appears in the brief accompanying said motion. The Administrator also made this reservation, both before the Supreme Court of Puerto Rico and during the prior administrative proceedings. Although the parties before the Supreme Court of Puerto Rico argued constitutional grounds contained in the Constitution of Puerto Rico, which are similar to those in the Federal Constitution, we see nothing in either that record or in the decision of that Court which touches on any Federal issue, constitutional or statutory. For us to conclude that the Supreme Court of Puerto Rico passed upon these Federal questions, we would have to presume that it did so *sub silentio*, without the benefit of briefs or arguments on those issues, and against the specific *England* reservations by both appellee and intervenor before it, conclusions which cause us some degree of difficulty.

But the PDP takes another tack. It argues that the *England* reservation is ineffective because it is valid only in *Pullman* type[7] abstention cases, and therefore the NPP's voluntary intervention, even for limited purposes, has *res judicata* effects ... "not only as to every ground of recovery or defense actually presented in the action, but also as to every ground which might have been presented..." *Cromwell v. County of Sac*, 94 U.S. 351, 352–353, 24 L.Ed. 195 (1877); *Lovely v. Laliberte*, 498 F.2d 1261, 1263 (C.A.1, 1974), cert. den. 419 U.S. 1038, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974).

There is no question but that in *England v. Medical Examiners*, supra, the Court had before it a case in which there was an abstention situation. In our view, however, we believe that Intervenor has missed the point. There is a constitutional right to having federal claims decided by federal courts. *Id.*, 375 U.S. at 415–16, 84 S.Ct. at 464. A party, of course, may forego this right and submit all issues, including federal ones, to adjudication by the State tribunals which are fully competent under our constitutional-legal system to entertain and decide these issues, where the parties so provide. *Id.* at 417–418, 84 S.Ct. 465. But federal constitutional and/or legal questions are the basis for distinct and separate causes of actions, which if expressly reserved by a litigant, can be saved for adjudication before the Federal forum. *Lovely v. Laliberte*, supra, at pages 1263–1264; *Sylvander v. New England Home For Little Wanderers*, 584 F.2d 1103, 1108 (C.A.1, 1978). See *Board of Regents v. Tomanio*, 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980), Cf. *Landrigan v. City of Warwich*, 628 F.2d 736, Slip Opinion (C.A.1, 1980). We respectfully decline to follow the dicta in *Roy v. Jones*, 484 F.2d 96 (C.A.3, 1973), a case in which it appears that, not only did litigants fail to make an *England* reservation before the Pennsylvania courts, but in which they in fact appear to have made "specific arguments that the suspension order violated the appellants'

7. *Railroad Com. of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

*federal* constitutional rights", 484 F.2d at 99 (emphasis in the original).

We have been assuming *arguendo* the validity of Intervenor's contention to the effect that the NPP voluntarily appeared before the Supreme Court of Puerto Rico, a conclusion which in the context of this case can be the subject of differing views. The PDP suggests that the appropriate action would have been for the NPP to remain aloof of the Supreme Court proceedings and to file its present action here, independently of the possibility of disposing of the controversy on non-federal grounds before that Court. Even with such a procedure, the PDP would have its cake and also eat it, as in that situation this Court would be forced to abstain from deciding pursuant to *Alabama Public Service Comm. v. Southern Ry. Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), but since this would not be *Pullman* type abstention, the NPP would not be entitled to an *England* reservation, and thus be deprived of a Federal forum for a decision of its Federal rights, to be left like the "little wanderers" in *Sylvander v. New England Home For Little Wanderers*, supra, from forum to forum.

Finally we should state that, considering the non-Federal basis of the decision of the Supreme Court of Puerto Rico, we fail to see how it could be the subject of review by the Supreme Court of the United States pursuant to 28 U.S.C. § 1258.

We can not see the rhyme or reason to such a conclusion. In our opinion the NPP acted correctly in appearing before the Supreme Court in seeking adjudication there of the State issues, while reserving its Federal questions under *England* for litigation in the Federal forum.

This conclusion moots the questions of privity raised by Intervenor, which in any event are clearly inapplicable to Plaintiff Rodríguez Suárez.

Although the standing by the NPP is unquestioned by Intervenor, this remains an open issue as to individual Plaintiffs.

In *Data Processing Service v. Camp*, 397 U.S. 150, 150–151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), the Court said:

"Generalizations about standing to sue are largely worthless as such. One generalization is, however, necessary and that is that the question of standing in the federal courts is to be considered in the framework of Article III which restricts judicial power to 'cases' and 'controversies.' As we recently stated in *Flast v. Cohen*, 392 U.S. 83, 101, [88 S.Ct. 1942, 1953, 20 L.Ed.2d 947] '[I]n terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.' ..."

No discussion of the issue of standing is complete without reference to the Supreme Court's ruling in *Warth v. Selding*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), a decision which summarizes the law, at pages 498–502, 95 S.Ct. at 2204.

... "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. In both dimensions it is founded in concern about the proper- and properly limited-role of the courts in a democratic society.

In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* [emphasis in the original] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even

though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action . . .'

Apart from this minimum constitutional mandate, this Court has recognized other limits on the class of persons who may invoke the courts' decisional and remedial powers. . . . [E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the *plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.*

. . . . .

"Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . .' Moreover, the source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes. Essentially, *the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.* In some circumstances, countervailing considerations may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties. In such instances, the Court has found, in effect, that the constitutional or statutory provision in question implies a right of action in the plaintiff. Moreover, *Congress may grant an express right of action to persons who otherwise would be barred by prudential*

*standing rules. Of course, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself even if it is an injury shared by a large class of other possible litigants. But so long as this requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim.*" (Emphasis supplied except as indicated; footnotes and citations omitted).

See also *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); *Baker v. Carr,* 369 U.S. 186 (1962); *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Linda R. S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Duke Power Co. v. Carolina Env. Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Arlington-Heights v. Metropolitan Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

The "personal stake" that is demanded of the federal litigant requires not only "a distinct and palpable injury" to that plaintiff, but also a "fairly traceable causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina Env. Study Group,* supra, 438 U.S. at page 72, 98 S.Ct. at 2629.

█ In the case of the individual Plaintiffs we cannot, without straining the connection to the breaking point, find the requisite causality between the alleged injury and the challenged conduct. *Schlesinger v. Reservists Committee To Stop The War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Their actions are therefore dismissed for lack of standing.

### THE DISPUTED BALLOTS

We thus come to the central issue in this case: Whether the counting by Defendant of the disputed ballots causes an injury to

Plaintiff PNP of Federal Constitutional dimensions, redressable by this Court in an action under 42 U.S.C. § 1983.

On this question our guiding light must be *Griffin v. Burns*, 570 F.2d 1065 (C.A. 1, 1978).

In that case a special Democratic primary election was held in the Tenth Ward of Providence, Rhode Island to select the Democratic candidate to run in a special election for a vacancy on the Providence City Council. Rhode Island law, as it stood in March of 1977, expressly permitted absentee and shut-in ballots in "all ... elections in the state for ... city, town, ward or district officers", but did not specify whether the "elections" in which absentee and shut-in ballots were allowed extended to the party primaries for such offices. R.I.Gen.Laws Sec. 17–20–1. The Secretary of State of Rhode Island and other election officials, believing the issuance of such ballots in party primaries to be authorized, and acting in accordance with a practice that had existed in Rhode Island for about seven years in the case of primaries, advertised and issued various such ballots for use in this primary. The primary was conducted, whereby the absentee and shut-in ballots gave candidate Lloyd Griffin a 15-vote plurality over candidate Thomas McCormick. Griffin was thereafter certified the winner by the Board of Canvassers.

After the primary, McCormick for the first time questioned the authority of the Secretary to issue and count absentee and shut-in ballots in a primary election. Failing to obtain relief in the State's administrative machinery, McCormick proceeded to file a petition for certiorari in the Rhode Island Supreme Court. In the petition, McCormick named as defendants, the State Board, the Board of Canvassers, the members of those boards, the Secretary of State, and his four opponents for the Democratic nomination. On April 27, 1977, the Rhode Island Supreme Court granted McCormick's petition and held that "there is no constitutional or statutory basis" for allowing the absentee and shut-in voters to cast their votes in a primary election. It thus ordered the invalidation of 123 such ballots and the quashing of Griffin's certification.

On April 27, 1977 the Board of Canvassers revoked Griffin's certification and on April 28, 1977, officially named McCormick the Democratic nominee. Griffin then filed a "Motion to Reargue" before the Rhode Island Supreme Court. That Court heard and rejected his contentions on May 2, 1977.

On April 29, 1977, while the motion to reargue was pending, Griffin and several shut-in and absentee voters who had cast their votes in the primary, sought a federal remedy and filed an action in the United States District Court for the District of Rhode Island, asking for temporary relief from invalidation of their ballots. Relief was denied initially in deference to the Rhode Island Supreme Court's pending considerations of Griffin's motion for reargument. After the state court's denial, Griffin and his co-plaintiffs again asked the district court for relief. This court issued a restraining order, holding that federally cognizable rights were implicated. The court declined jurisdiction over Griffin on the ground that his claim had been adjudicated by the Rhode Island Court (he had failed to make any *England* reservation). The district court invalidated the March 29 primary, postponed the general election and scheduled a new primary and election in which the ground rules were clear. Preliminary to this order, the district court found as a fact that the absentee and shut-in vote had affected the outcome of the election.

The Court of Appeals sustained the district court's action. The Court of Appeals quoted from *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1953), at pages 554–555, 84 S.Ct. at 1377.

> "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear.

It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, and to have their votes counted. In *Mosley* the Court stated that it is 'as equally unquestionable that the right to have one's vote counted is as open to protection ... as the right to put a ballot in a box.' The right to vote can neither be denied outright *nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing.* As the Court stated in *Classic,* 'Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted....' " Racially based gerrymandering, and the conducting of white primaries, both of which result in denying to some citizens their right to vote, have been held to be constitutionally impermissible. And history has seen a continuing expansion of the scope of the right of suffrage in this country. The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. *And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.*" *Griffin,* 570 F.2d at 1074–1075. (Emphasis supplied; citations and footnotes omitted).

In analyzing whether the complained action amounted to a constitutional violation entitling plaintiffs to a remedy in federal court, the Court of Appeals stated at 570 F.2d 1077:

"The federal court is not equipped nor empowered to supervise the administration of a local election. If every election irregularity or contested vote involved a federal violation, the court would 'be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law.'

But while, as the foregoing authorities indicate, local election irregularities, including even claims of official misconduct, do not usually rise to the level of constitutional violations where adequate state corrective procedures exist, there remain some cases where a federal role is appropriate. The right to vote remains, at bottom, a federally protected right. If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under s1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots; and the question of the availability of a fully adequate state corrective process is germane. But there is precedent for federal relief where broadgauged unfairness permeates an election, even if derived from apparently neutral action." (Citations omitted).

The Court then analyzes the decision in *Ury v. Santee,* 303 F.Supp. 119 (N.D.Ill., 1969), in which a federal district court invalidated a local election because of confusion caused by last minute precinct reductions, and *Briscoe v. Kusper,* 435 F.2d 1046 (C.A. 7, 1970), also involving "eleventh hour change of policy."

The Court goes on to say (at 570 F.2d 1078–1079):

"While there is no single bright line to distinguish *Ury* and *Briscoe* from the cases cited earlier in which federal courts have declined to intervene, it is apparent that in both cases the attack was, broadly, upon the fairness of the official terms and procedures under which the election was conducted. The federal courts were not asked to count and validate ballots and enter into the details of the administration of the election. Rather they were confronted with an officially-sponsored election procedure which, in its basic as-

pect, was flawed. Due process, '[r]epresenting a profound attitude of fairness between man and man, and more particularly between individual and government,' *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 163, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), is implicated in such a situation. To be sure, Justice Frankfurter's language does not provide a litmus test for the determination of federal jurisdiction in every voting case. But *for present purposes there is guidance enough in the notion that due process is implicated where the entire election process—including as part thereof the state's administrative and judicial corrective process—fails on its face to afford fundamental fairness. Further than that we need not go. In cases falling within such confines, we think a federal judge need not be timid, but may and should do what common sense and justice require.*

'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.' *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 556, 535, 11 L.Ed.2d 481 (1964).

The present situation, judged in light of the standards we have discussed, presented a due process violation for which relief under s1983 was appropriate. The district court was not asked to examine the validity of individual ballots or to supervise the administrative details of a local election. It was asked to remedy a broadgauged unfairness that infected the results of a local election. The integrity of the Tenth Ward primary in Providence was severely impugned by the undisputed events leading up to Plaintiffs' suit. Almost ten percent of the qualified and voting electorate was, in effect, denied its vote in this close election because the Secretary of State, statutorily authorized manager of state elections, advertised, is-

sued, and sanctioned the use of certain ballots *which the Rhode Island Supreme Court quashed after the results of the election were in.* Voting by absentee and shut-in ballots had been accepted in the state over a period of about seven years; the legislature had never acted to halt the practice, and indeed, directly after the Rhode Island Supreme Court's decision, moved to reinstate it, explicitly authorizing the use of absentee and shut-in ballots in state primaries. 1977 R.I.Pub. Laws ch. 153. Prompt objection to quashing the ballots was made in federal court by the voters; and the federal court acted only after they were refused permission to intervene at the state court proceeding. The district judge could justifiably conclude that the voters, including the black voters, would be offended by the cancelling of the ballots notwithstanding their established acceptability— *due process involves the appearance of fairness as well as actual fairness.* And the federal court was the only practical forum for redress: there appears to have been no standard state procedure for handling a claim such as this, *and the state court did not confront the questions that retroactive application of its ruling would create.*

In brief, we think this to be one of the perhaps exceptional cases where a district court could properly exercise the limited supervisory role that such courts have in election cases." (Emphasis supplied).

The Court concludes its analysis at 570 F.2d 1080 by saying:

" . . . While the 'outcome' test provides a sensible guideline for determining when federal judicial invalidation of an election might be warranted, it is not a principle requiring mathematical certainty. In cases of outrageous racial discrimination some courts have chosen not to apply it at all, but to invalidate the election simply for its lack of integrity. And when applied, different formulations of the test have been proposed: the irregularity

'could have altered the outcome', the outcome 'would not have been affected,' and altered outcome should be 'found readily where there is a serious violation and close election.' Here, the *closeness of the election was such that, given the retroactive invalidation of a potentially controlling number of the votes cast, a new primary was warranted.*" (Emphasis ours; citations omitted).

■ In our opinion the lesson to be learned from *Griffin* is, that changing the rules of the game after it has been played and the score is known, violates fundamental rules of fair play. Such action gives the appearance of, as well as is, actual unfairness and consequently violates due process of law. The counting of ballots after an election which, under the rules prevalent at the time of the vote-casting were considered void and invalid, is the practical and functional equivalent of alteration of ballots or of stuffing the ballot-box, because as in those cases, it amounts to the counting of legally inexistent votes. Cf. *United States v. Classic*, 313 U.S. 299, 315, 61 S.Ct. 1031, 1037, 85 L.Ed. 1368 (1941). It thus brings about the dilution and debasement of the validly cast votes.

Given the circumstances of this case, we are of the opinion that substantial Federal constitutional rights of Plaintiff NPP have been affected, which considering the lack of an adequate remedy at law and the irreparable nature of the injury to be suffered, entitle this party to equitable relief before this Court. Common sense and justice dictate this outcome.

### THE REMEDY

Citing *Griffin*, supra, Intervenor PDP states that "[t]he only remedy that can be granted in this kind of cases is the annulment of the affected election and the holding of a new one."

We decline this invitation to further anarchy.

Courts when sitting in equity are given great latitude in fashioning remedies. The purpose behind equitable relief is to correct the inequitable situation.

These principles were summarized in *Lemon v. Kurtzman*, 411 U.S. 192, 200–201, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1972):

". . . [E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable. 'Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.' Mr. Justice Douglas, speaking for the Court, has said:

'The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicability have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.'

In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots." (Citations omitted).

The inequitable situation to be corrected in the present case is the counting of ballots that were marked by electors outside "the space under the printed insignia or device of the party" or outside "the square in which the candidate's name appears." The evidence in the case was to the effect that these ballots have been duly safeguarded and that they can be readily identified and retrieved by the appropriate electoral authorities from the ballot bundles kept in accordance to law. Once this is accomplished, the re-tallying of the ballots in affected elections is but a mere mathematical formality.

It is this remedy that is appropriate under the circumstances.

Wherefore, it is ORDERED:

(1) That Defendant Gerineldo Barreto Pérez, Administrator of the Puerto Rico Elections Commission, and all persons under his direction and employ or acting as his agents, as well as others acting in concert therewith, are hereby permanently enjoined and estopped from counting as valid any vote cast in the general elections held in the Commonwealth of Puerto Rico on November 4, 1980 which was marked by any elector outside "the space under the printed insignia or device of the party" or outside "the square in which the candidate's name appears", and further

(2) That said Defendant proceed forthwith and with all deliberate speed to carry out the appropriate recount and rectification in the affected precincts to allow for the certification of all concerned candidates by no later than December 31, 1980, at 12:00 P.M.

IT IS SO ORDERED.

APPENDIX A

**MODELO** COMISION ESTATAL DE ELECCIONES
 ELECCIONES GENERALES **MODELO**

Municipio de __MAYAGUEZ__ X **PAPELETA ELECTORAL** Precinto Núm. ___44___

Distrito Senatorial Núm. ___6___ 4 DE NOVIEMBRE DE 1980 Distrito Representativo Núm. ___19___

| PARTIDO NUEVO PROGRESISTA | PARTIDO POPULAR DEMOCRATICO | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | PARTIDO SOCIALISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|---|
| Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico |
| 1 Carlos Romero Barceló | 1 Rafael Hernández Colón | 1 Rubén Berríos Martínez | 1 Luis Lausell Hernández | 1 |
| 2 Baltasar Corrada del Río | 2 José Arsenio Torres | 2 Marta Font de Calero | 2 | 2 |
| 3 Israel Roldán González | 3 Miguel A. Deynes Soto | 3 Baltasar Quiñones Elías | 3 José J. Rodríguez Yulfo | 3 |
| 4 Justo Morales Santiago | 4 Antonio J. (Tony) Fas Alamo | 4 Armengol Iglesias Guzmán | 4 Luis Antonio Toro Goyco | 4 |
| 5 Armando Pérez Ortiz | 5 Esteban Rosado Báez | 5 Ismael Vargas Muñoz | 5 Diana Bianchi Román | 5 |
| 6 José Clemente González Ortiz | 6 Benjamín Cole | 6 Eudaldo Báez Cruz | 6 Loida Figueroa Mercado | 6 |
| 7 Virginia Gaud González | 7 Eugenio Del Valle Del Valle | 7 Orlando Serrano Valle | 7 Tomás Gordils Martínez | 7 |
| 8 Joaquín González Lagos | 8 Efraín Diodonet Quintana | 8 Manuel Canabal Lopes | 8 Alba Nydia Rivera Ramos | 8 |
| 9 Alfredo González Valentín | 9 Hiram David Cabezas | 9 Consuelo Ramos Nadal | 9 Héctor Luis Ortiz Menendez | 9 |
| 10 Eleazar Caro Martínez | 10 Laureano Rosafort Camano | 10 Reinaldo Cintron | 10 | 10 |
| 11 Carlos R. Matos Sánchez | 11 Angel González Cuevas | 11 Beatriz Quiñones Cancel | 11 | 11 |
| 12 Nelson Fernández Pérez | 12 Erasmo Rafael Lamberty Sánchez | 12 Pablo Lopes Gonzáles | 12 | 12 |
| 13 Erodina (Loim) Ramos Quiles | 13 Carlos D. Rice Torres | 13 Ilis Forestier | 13 | 13 |
| 14 Gilberto Rivera Vélez | 14 Ernesto Torres Silva | 14 Pedro Vargas | 14 | 14 |
| 15 Jaime (Jimmy) Valentín Vélez | 15 Nelson J. Zapata Pérez | 15 Javier Muñiz Quiñones | 15 | 15 |
| 16 Luis Cruz Morales | 16 José Pérez Rodríguez | 16 Rafael Romero | 16 | 16 |
| 17 Manuel A. Paz Ruíz | 17 Eloida D'Acosta De Castello | 17 René Cabán | 17 | 17 |
| 18 Domingo (Reinaldo) Ortiz Rodríguez | 18 Marina Parés Ramírez | 18 Luis Roberto Nieto | 18 | 18 |
| 19 Alfredo Ocasio Pérez | 19 Evelyn Rodríguez Rivera | 19 Segaraundo Lopes | 19 | 19 |

| SENADORES POR ACUMULACION | SENADORES POR ACUMULACION | SENADORES POR ACUMULACION | SENADORES POR ACUMULACION | SENADORES POR ACUMULACION |
|---|---|---|---|---|
| 1 Luis A. Ferré Aguayo | 1 Sergio A. Peña Clos | 1 Luis A. Rivera Lacourt | 1 Juan Mari Bras | 1 |
| 2 Nicolás Nogueras Cartagena | 2 Justo A. Méndez | 2 Justo Echevarría Figueroa | 2 | 2 |
| 3 Miguel A. (Mickey) Miranda | 3 Víctor M. Rodríguez | 3 Héctor Rene Lugo Ríos | 3 | 3 |
| 4 Edwin Ramos Yordan | 4 Miguel Hernández Agosto | 4 José J. Hernández Rivera | 4 | 4 |
| 5 Calixto Calero Juarbe | 5 Francisco (Fuco) Aponte Pérez | 5 Luis F. Ramos Ramos | 5 | 5 |
| 6 Efraín Santiago | 6 Velda Gonzales | 6 Armando Torres Ortiz | 6 | 6 |

| REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION |
|---|---|---|---|---|
| 1 Angel Viera Martínez | 1 Rony Jarabo | 1 Anel Colon Pratts | 1 Carlos Gallisa Bisbal | 1 |
| 2 Luis M. Ayala del Valle | 2 Luis Muñoz Arjona | 2 Felix Rodríguez Hernández | 2 | |
| 3 Charlie Rodríguez | 3 Severo Colberg | 3 Fernando Martin García | 3 | |
| 4 José Granados Navedo | 4 Luis A. Duprey | 4 Carlos Mondríguez Torres | 4 | |
| 5 Freddy Valentín Acevedo | 5 Fernando Tonos | 5 Juan José Juarbe Juarbe | 5 | |
| 6 Osvaldo Torres Velázquez | 6 José E. Arraras | 6 Irma Rodríguez Morales | 6 | |