# Altering Puerto Rico's Relationship with the United States Through Referendum

Legislation conditioning a change in Puerto Rico's political relationship with the United States on the results of one or more referenda by the Puerto Rican electorate, without subsequent congressional action, would be constitutional, insofar as the referendum or referenda presented voters in the territory with a limited set of options specified in advance by Congress.

March 7, 2012

MEMORANDUM OPINION FOR THE
ASSOCIATE ATTORNEY GENERAL

In your role as co-chair of the President's Task Force on Puerto Rico's Status, you asked us to consider whether "the President [may] support and Congress enact legislation that triggers implementation of whichever status outcome the citizens of Puerto Rico choose with no further action by Congress (with the understanding that such legislation may not be binding on future Congresses)."[1] This memorandum memorializes advice we provided to you prior to the release of the Report by the President's Task Force in March 2011.[2] For the reasons given below, we concluded that legislation conditioning a change in Puerto Rico's political relation-

---

[1] E-mail for Jonathan Cedarbaum, Deputy Assistant Attorney General, Office of Legal Counsel, from Mala Adiga on behalf of Thomas J. Perrelli, Associate Attorney General, *Re: Puerto Rico Questions* (June 14, 2010).

[2] *Report by the President's Task Force on Puerto Rico's Status* (Mar. 2011), http://www.whitehouse.gov/sites/default/files/uploads/Puerto_Rico_Task_Force_Report.pdf ("2011 Task Force Report"). President Clinton established the President's Task Force on Puerto Rico's Status by executive order on December 23, 2000. *See* Exec. Order No. 13183, 3 C.F.R. 340 (2001), *reprinted as amended in* 48 U.S.C. § 731 note (2006 & Supp. IV 2010). As amended by subsequent executive orders, this order provides that the Task Force is "composed of designees of each member of the President's Cabinet and the Deputy Assistant to the President and Director for Intergovernmental Affairs," and is co-chaired by the Attorney General's designee and the Deputy Assistant to the President and Director for Intergovernmental Affairs. *Id*. § 2; *see* Exec. Order No. 13517, 74 Fed. Reg. 57,239 (Oct. 30, 2009); Exec. Order No. 13319, 3 C.F.R. 267 (2004); Exec. Order No. 13209, 3 C.F.R. 765 (2002). The Task Force is responsible for, among other things, "ensur[ing] official attention to and facilitat[ing] action on matters related to proposals for Puerto Rico's status and provid[ing] advice and recommendations on such matters to the President and the Congress." Exec. Order No. 13183, § 3.

ship with the United States on the results of one or more referenda by the Puerto Rican electorate, without subsequent congressional action, would be constitutional, insofar as the referendum or referenda presented voters in the territory with a limited set of options specified in advance by Congress.

Congress generally may condition the legal effect of legislation on the existence of future contingencies, including whether an affected constituency approves the legislation. Neither of the clauses of the Constitution relevant here—the Territory Clause or the State Admission Clause—restricts Congress's authority to enact legislation that would condition a change in a territory's political relationship with the United States on the outcome of a territorial referendum. Moreover, an extensive and long-standing congressional practice of granting statehood or independence to territories upon approval by the territory's electorate and without the need for subsequent congressional action confirms the constitutionality of this method for changing a territory's status. This Office and various Department officials repeatedly have endorsed this view over the years, including with respect to Puerto Rico.

We note at the outset that there are limitations on Congress's authority to provide for certain outcomes. The Executive Branch, for example, has long taken the position that Congress may not constitutionally provide for the so-called "enhanced commonwealth" status, to the extent that such status would entail requiring the consent of the Puerto Rican people before Congress could make any subsequent changes in Puerto Rico's political relationship with the United States.[3] In this memorandum, we address only the constitutionality of a particular process by which a change in Puerto Rico's relationship with the United States might be brought about: a process that would involve the passage of federal legislation that would condition its own effects on the outcome of a vote by Puerto Rico's electorate and would not require any subsequent action by Congress.

## I.

The Supreme Court has described Puerto Rico as having "a relationship to the United States 'that has no parallel in our history.'" *Califano v.*

---

[3] *See* 2011 Task Force Report, *supra* note 2, at 26.

*Torres*, 435 U.S. 1, 3 n.4 (1978) (per curiam) (quoting *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 596 (1976)). The United States acquired Puerto Rico from Spain in 1898, pursuant to the Treaty of Paris that concluded the Spanish-American War. Over time, in successive organic statutes that established local governmental institutions for the territory, Congress gave Puerto Rico increasing degrees of autonomy. Puerto Rico acquired its current status as a self-governing "commonwealth" through federal statutes passed in 1950 and 1952. The former authorized the Puerto Rican people to adopt a constitution for Puerto Rico's local self-government, and the latter approved the proposed constitution (subject to the inclusion of certain amendments). *See* Pub. L. No. 82-447, 66 Stat. 327 (1952); Pub. L. No. 81-600, 64 Stat. 319 (1950) (codified at 48 U.S.C. §§ 731b–731e (2006)).[4]

Today, Puerto Rico has extensive powers of self-government. In "many respects," its government "resembles that of a state," in that it consists of "an elected governor and legislature, and its legislature has powers akin to those exercised by the states." *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 7 (1st Cir. 1992); *see also Examining Bd.*, 426 U.S. at 594 (Puerto Rico possesses "the degree of autonomy and independence normally associated with States of the Union"). Indeed, for many federal administrative purposes, Puerto Rico is treated as the functional equivalent of a State. In 1992, President George H.W. Bush issued a directive that remains in force today, requiring:

> all Federal departments, agencies, and officials, to the extent consistent with the Constitution and the laws of the United States, henceforward to treat Puerto Rico administratively as if it were a State, except insofar as doing so with respect to an existing Federal program or activity would increase or decrease Federal receipts or expenditures, or would seriously disrupt the operation of such program or activity.

---

[4] *See also* Treaty of Paris, U.S.-Spain, Dec. 10, 1898, 30 Stat. 1754; Foraker Act, ch. 191, 31 Stat. 77 (1900); Jones Act (Puerto Rico), ch. 145, 39 Stat. 951 (1917); *see generally Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 671–72 (1974) (discussing history of relations between Puerto Rico and the United States); *United States v. Sanchez*, 992 F.2d 1143, 1151 (11th Cir. 1993) (same); *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 6–7 (1st Cir. 1992) (same).

Memorandum for the Heads of Executive Departments and Agencies, 57 Fed. Reg. 57,093 (Nov. 30, 1992), *reprinted in* 48 U.S.C. § 734 note (2006).

For constitutional purposes, Puerto Rico nonetheless remains a territory of the United States and is therefore subject to the Territory Clause and the State Admission Clause—constitutional provisions that give Congress the general authority to govern territories and the specific authority to admit new territories as states, respectively.[5] *See* U.S. Const. art. IV, § 3. The question thus becomes whether either of these two provisions, or any other constitutional requirement, precludes Congress from changing Puerto Rico's relationship with the United States through legislation that would condition the effect of that legislation on the results of a vote by the Puerto Rican electorate.

As a general matter, Congress may enact legislation conditioning the effectiveness of laws or regulations on approval by affected parties,[6] and we conclude that neither the Territory Clause nor the State Admission Clause prevents Congress from enacting such legislation to change Puerto

---

[5] *See, e.g.*, *Examining Bd.*, 426 U.S. at 586 (discussing Congress's "establishment of the civil government in Puerto Rico in the exercise of its territorial power under Const., Art. IV, § 3, cl. 2"); *Harris v. Rosario*, 446 U.S. 651, 651–52 (1980) (per curiam) (describing Congress as "empowered under the Territory Clause of the Constitution" to "treat Puerto Rico differently from States so long as there is a rational basis for its actions"); *Igartua-de la Rosa v. United States*, 417 F.3d 145, 147 (1st Cir. 2005) (en banc) (holding that Puerto Rico "is not a 'state' within the meaning of the Constitution").

[6] *See, e.g.*, *Currin v. Wallace*, 306 U.S. 1, 15–16 (1939) (upholding law permitting tobacco regulations to take effect only if approved by two-thirds of growers in a prescribed referendum); *United States v. Rock Royal Coop., Inc.*, 307 U.S. 533, 577–78 & n.64 (1939) (upholding similar referendum provision based on *Currin*); *Wickard v. Filburn*, 317 U.S. 111, 117–18 (1942) (rejecting challenge to referendum among wheat growers on quotas proposed by Secretary of Agriculture); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisc. v. United States*, 367 F.3d 650, 653, 659–60 (7th Cir. 2004) (upholding requirement of state governor's concurrence in federal official's determination because "[t]here is no 'delegation of legislative authority' to [an] actor whose assent is a precondition to the execution of the law" (quoting *Currin*, 306 U.S. at 15)); *Confederated Tribes of Siletz Indians of Ore. v. United States*, 110 F.3d 688, 695 (9th Cir. 1997) ("[b]y requiring local approval, Congress is exercising its legislative authority by providing what conditions must be met before a statutory provision goes into effect"); *Mutual Consent Provisions in the Proposed Guam Commonwealth Act*, __ Op. O.L.C. Supp. __, *14 n.13 (July 28, 1994) (concluding, based on *Currin*, that "approval of federal legislation by" the government of a territory (in that case Guam) may be "a legitimate condition for making that legislation applicable").

Rico's status. First, under the Territory Clause, Congress has "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. The Supreme Court has characterized this clause as "grant[ing] Congress and the President the power to acquire, dispose of, and govern territory." *Boumediene v. Bush*, 553 U.S. 723, 765 (2008). It has long been established that Congress's authority to govern and dispose of territories includes the authority to provide for changes in territories' degree of self-government,[7] and to provide for even more fundamental changes in their political relationship with the United States, including by granting them independence.[8] Nothing in the text, structure, or purpose of the Territory Clause limits Congress's authority to provide for a change in a territory's governmental structure through the referendum process under consideration here, nor are we aware of any judicial decisions articulating such limits. In addition, nothing in the Clause would prevent Congress from making any change in Puerto Rico's status effective upon a favorable vote by the territory's electorate and without need for subsequent congressional action.

Second, though the State Admission Clause places certain express limitations on Congress's authority to create new states, these limitations would not apply to the admission of Puerto Rico. The Clause provides:

> New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.

U.S. Const. art. IV, § 3, cl. 1. The State of Puerto Rico would neither be formed within the jurisdiction of any other state nor formed by the junc-

---

[7] *See, e.g.*, *United States v. Lara*, 541 U.S. 193, 203–04 (2004) (noting that "[t]he political branches" historically have made "radical adjustments" in the "autonomous status of . . . dependent entities," including Puerto Rico); *Calero-Toledo*, 416 U.S. at 671 (describing series of congressional enactments under which Puerto Rico progressed from initial "military control" to appointed government to substantial self-governance); *Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434, 441–45 (1871) (discussing enactments organizing governments for the United States' first territories).

[8] *See, e.g.*, *Barber v. Gonzales*, 347 U.S. 637, 638–39 & n.1 (1954) (discussing legislation that resulted in the independence of the Philippines).

97

tion of parts of two or more states. What is more, the Clause includes no express limitation on Congress's authority to condition the admission of a state on an affirmative vote of a territory's electorate without subsequent congressional action. In fact, as described in detail below, Congress has often admitted states through such means.

## II.

## A.

Congress has frequently admitted states to the Union through contingent legislation. While the conditions Congress has imposed have varied, contingent statutes have often made admission of a territory effective upon the issuance of a presidential proclamation certifying that the statutory conditions have been fulfilled, without any subsequent action by Congress having been required. Congress has identified a vote by the territorial electorate in favor of statehood or in support of a state constitution (or constitutional amendment) as the triggering event for admission in many instances.

The two newest states—Alaska and Hawaii—were both admitted under statutes that conditioned admission on a referendum of the territorial electorate. In the case of Alaska, the statehood statute directed the governor of the territory to submit three propositions to the territory's voters. Act of July 7, 1958, Pub. L. No. 85-508, § 8(b), 72 Stat. 339, 343–44. One of these propositions asked voters: "Shall Alaska immediately be admitted into the Union as a State?" *Id.*, 72 Stat. at 344. The other two sought Alaska voters' consent to specific territorial boundaries and certain other conditions of Alaska's admission under the Act. *Id.* The Act required the governor to "certify the results of said submission, as . . . ascertained [by the Secretary of Alaska through a specified process], to the President of the United States." *Id.*

The statehood statute ultimately provided that, "[i]n the event any one of the [specified] propositions is not adopted at [the designated] election by a majority of the legal votes cast on said submission, the provisions of this Act shall thereupon cease to be effective," meaning that Alaska would not become a state under the statute. *Id.* If the propositions were approved, however, the Act authorized admission of Alaska upon presidential proclamation, without further action by Congress. The Act provided:

> If the President shall find that the propositions set forth in [the Act] have been duly adopted by the people of Alaska, the President, upon certification of the returns of the election of the [congressional Representative and Senators] required to be elected [under the Act], shall thereupon issue his proclamation announcing the results of said election as so ascertained. Upon the issuance of said proclamation by the President, the State of Alaska shall be deemed admitted into the Union as provided in section 1 of this Act.

*Id.* § 8(c), 72 Stat. at 344. Section 1 of the Act in turn provided "[t]hat, subject to the provisions of this Act, and upon issuance of the proclamation required by section 8(c) of this Act, the State of Alaska is hereby declared to be a State of the United States of America[] [and] is declared admitted into the Union on an equal footing with the other States in all respects whatever." *Id.* § 1, 72 Stat. at 339.

President Eisenhower signed the Alaska Statehood bill on July 7, 1958, and said he was "pleased with the action of Congress admitting Alaska." *Statement by the President Upon Signing Alaska Statehood Bill* (July 7, 1958), 1 Pub. Papers of Dwight D. Eisenhower 525 (1958). On January 3, 1959, after Alaska voters had considered the propositions contemplated by the statute, the President issued the required proclamation "find[ing] and announc[ing] that the people of Alaska have duly adopted the propositions required to be submitted to them by the act of July 7, 1958 and have duly elected the officers required to be elected by that act." Proclamation No. 3269, 3 C.F.R. 16 (Supp. 1959), *reprinted in* 48 U.S.C. ch. 2 note following table of contents (2006). President Eisenhower thus "declare[d] and proclaim[ed] that the procedural requirements imposed by the Congress on the State of Alaska to entitle that State to admission into the Union have been complied with in all respects and that admission of the State of Alaska into the Union on an equal footing with the other States of the Union is now accomplished." *Id.*

Congress enacted Hawaii's statehood statute several months after Alaska's admission and provided for a virtually identical admissions process. Congress required Hawaii's voters to answer three questions similar to those specified in the Alaska referendum, including "Shall Hawaii immediately be admitted into the Union as a State?" Pub. L. No. 86-3, § 7(b), 73 Stat. 4, 7 (1959). Congress also required the election of a congressional Representative and Senators for Hawaii; directed the President to issue a

proclamation certifying when these conditions were satisfied; and provided that "[u]pon the issuance of said proclamation by the President, the State of Hawaii shall be deemed admitted into the Union as provided in section 1 of this Act." *Id.* The Act, like the Alaska statute, established that, "subject to the provisions of this Act, and upon issuance of the proclamation required by [the Act], the State of Hawaii is hereby declared to be a State of the United States of America[] [and] is declared to be admitted into the Union on an equal footing with the other States in all respects whatever." *Id.* §§ 1, 7, 73 Stat. at 4, 7–8. Upon signing the Hawaii statehood bill, President Eisenhower observed that "[i]t has given me great satisfaction to sign the Act providing for the admission of Hawaii into the Union" and noted that, "[u]nder this legislation, the citizens of Hawaii will soon decide whether their Islands shall become our fiftieth State." S*tatement by the President Upon Signing the Hawaii Statehood Bill* (Mar. 18, 1959), 1 Pub. Papers of Dwight D. Eisenhower 286 (1959). After the territorial referendum, the President issued the required proclamation certifying Hawaii's admission to the union on August 21, 1959. Proclamation No. 3309, 3 C.F.R. 60 (Supp. 1959), *reprinted in* 48 U.S.C. ch. 3 note following table of contents (2006).

Although Alaska and Hawaii are the only states whose admission was conditioned on referenda that expressly addressed statehood, Congress has admitted some ten other states pursuant to statutes that granted statehood once territorial voters had approved certain measures, without further congressional action. Congress made the admission of Arizona and West Virginia effective upon popular ratification of certain amendments to the proposed state constitutions.[9] Similarly, Congress provided for the admission of Oklahoma, Utah, Washington, Montana, South Dakota, North Dakota, Colorado, and Nevada effective upon presidential proclamation, without further congressional action, once territorial voters had approved state constitutions meeting specified criteria.[10]

---

[9] *See* S.J. Res. 57, § 7, 37 Stat. 39, 42 (Aug. 21, 1911) (Arizona); Proclamation of Feb. 14, 1912, 37 Stat. 1728 (noting approval of amendment); Act of Dec. 31, 1862, ch. 6, § 2, 12 Stat. 633, 634 (West Virginia); Proclamation of Apr. 20, 1863, 6 *Compilation of the Messages and Papers of the Presidents* 167 (James D. Richardson ed., 1897) ("*Messages & Papers*") (noting compliance with condition).

[10] *See* Pub. L. No. 59-234, § 4, 34 Stat. at 271 (Oklahoma); Proclamation of Nov. 16, 1907, 35 Stat. 2160 (Oklahoma); Act of July 16, 1894, ch. 138, § 4, 28 Stat. 107, 108–09 (Utah); Proclamation of Jan. 4, 1896, 29 Stat. 876 (Utah); Act of Feb. 22, 1889, ch. 180,

Congress also has passed contingent admission legislation for territories that were ultimately admitted under different, subsequent legislation, in some cases because voters in the territory rejected the conditions imposed by Congress in the original contingent legislation. *See, e.g.*, Pub. L. No. 59-234, §§ 24, 26, 34 Stat. 267, 278, 280–81 (1906) (providing for admission of State of Arizona following voter approval of constitution, but only if voters in the territories of both Arizona and New Mexico answered in the affirmative, "Shall Arizona and New Mexico be united to form one state?")[11]; Act of Apr. 19, 1864, ch. 59, § 5, 13 Stat. 47, 48–49 (providing for admission of Nebraska upon voter approval of state constitution)[12]; Act of May 4, 1858, ch. 26, 11 Stat. 269, 270 (providing for admission of Kansas upon voter acceptance of specified propositions)[13]; Act of Mar. 3, 1847, ch. 53, § 4, 9 Stat. 178, 179 (providing for admission of Wisconsin upon voter approval of state constitution)[14]; Act of Mar. 3,

---

§ 8, 25 Stat. 676, 678–79 (North Dakota, South Dakota, Montana, and Washington); Proclamation of Nov. 11, 1889, 26 Stat. 1552 (Washington); Proclamation of Nov. 8, 1889, 26 Stat. 1551 (Montana); Proclamation of Nov. 2, 1889, 26 Stat. 1549 (South Dakota); Proclamation of Nov. 2, 1889, 26 Stat. 1548 (North Dakota); Act of Mar. 3, 1875, ch. 139, § 5, 18 Stat. 474, 475, as amended by Act of Mar. 3, 1876, ch. 17, 19 Stat. 5 (Colorado); Proclamation of Aug. 1, 1876, 9 *Messages & Papers* n.s. 4346 (1897) (Colorado); Act of Mar. 21, 1864, ch. 36, § 5, 13 Stat. 30, 31–32 (Nevada); Proclamation of Oct. 31, 1864, 13 Stat. 749 (Nevada). New Mexico's admission became effective once the territory had held a referendum on specified propositions, although Congress did not require that the vote result in any particular outcome. *See* S.J. Res. 57, §§ 3–6, 37 Stat. 39, 39–42 (Aug. 21, 1911) (requiring "as a condition precedent" to admission that the New Mexico electorate vote on specified amendments to the New Mexico constitution); Proclamation of Jan. 6, 1912, 37 Stat. 1723 (finding that vote was held and thus deeming New Mexico admitted to Union); Robert W. Larson, *New Mexico's Quest for Statehood: 1846–1912* 296 (1968).

[11] Arizona voters rejected this proposition. *See* John D. Leshy, *The Making of the Arizona Constitution*, 20 Ariz. St. L.J. 1, 15–16 (1988).

[12] A constitutional convention convened pursuant to this statute failed to approve a constitution. 2 *The Uniting States: The Story of Statehood for the Fifty United States* 739–40 (Benjamin F. Shearer ed., 2004). Nebraska was later admitted under a different statute. *See infra* note 16.

[13] Kansas voters rejected the pro-slavery constitution on which this admission statute was based. Kansas was later admitted by statute with a different state constitution. *See* Act of Jan. 29, 1861, ch. 20, 12 Stat. 126; 1 *Uniting States*, *supra* note 12, at 450–51.

[14] Wisconsin voters rejected a constitution proposed pursuant to this Act, but Congress later admitted Wisconsin by statute following the ratification of a different state constitu-

1845, ch. 48, §§ 2, 4, 5 Stat. 742, 743 (providing for admission of Iowa upon popular approval of conditions, including specified boundaries for the State, set forth in the act)[15]; Act of June 15, 1836, ch. 96, §§ 2, 3, 5 Stat. 49, 49–50 (providing for admission of Michigan upon acceptance of boundary conditions by popularly elected convention).[16]

The historical record thus provides overwhelming support for the conclusion that Congress may adopt legislation that would authorize Puerto Rico's admission as a State, effective upon approval by the Puerto Rican electorate.

## B.

In addition to enacting contingent legislation to govern transitions to statehood, Congress has relied on such legislation to accomplish other

---

tion. *See* Act of May 29, 1848, ch. 50, 9 Stat. 233; 3 *Uniting States*, *supra* note 12, 1344, 1346.

[15] Iowa voters rejected these conditions, but Iowa was later admitted by statute with adjusted boundaries. *See* Act of Dec. 28, 1846, ch. 1, 9 Stat. 117; Act of Aug. 4, 1846, ch. 82, 9 Stat. 52; 1 *Uniting States*, *supra* note 12, at 424.

[16] The first convention elected pursuant to this statute rejected the boundary conditions, but a second convention accepted them and Congress admitted Michigan by statute, declaring the conditions in its prior enactment satisfied. *See* Act of Jan. 26, 1837, ch. 6, 5 Stat. 144; 2 *Uniting States*, *supra* note 12, at 610–14.

In other cases, Congress has provided for admission of territories as States upon presidential proclamation following satisfaction of conditions that did not necessarily involve a referendum. *See* Act of Feb. 9, 1867, ch. 36, § 3, 14 Stat. 391, 392 (conditioning Nebraska's admission on the legislature's declaration of assent to "the fundamental condition that within the State of Nebraska there shall be no denial of the elective franchise, or of any other right, to any person, by reason of race or color, excepting Indians not taxed"); Proclamation of Mar. 1, 1867, 14 Stat. 820 (deeming condition satisfied and Nebraska admitted as a state); J. Res. No. 1 of Mar. 2, 1821, 3 Stat. 645 (conditioning Missouri's admission upon the legislature's assent, "by a solemn public act," to the "fundamental condition" that a provision in the proposed Missouri state constitution "shall never be construed to authorize the passage of any law, and that no law shall be passed in conformity thereto, by which any citizen, of either of the states in this Union, shall be excluded from the enjoyment of any of the privileges and immunities to which such citizen is entitled under the constitution of the United States"); Proclamation of Aug. 10, 1821, 2 *Messages & Papers* 95 (1896) (deeming condition satisfied and Missouri admitted); *cf.* Act of Feb. 4, 1791, ch. 4, 1 Stat. 189 (deeming Kentucky admitted as of date some sixteen months after enactment).

changes in territories' political relationship with the United States, including transitions to independence.

In 1933 and 1934, for example, Congress passed contingent legislation providing for the independence of the Philippines, which had become a United States territory in 1898 after the Spanish-American War and through the Treaty of Paris. Both statutes provided that the Philippines would acquire independence upon issuance of a presidential proclamation, without further congressional action, ten years after the formation of a new Philippine government pursuant to a popularly ratified constitution that satisfied certain requirements.[17] The Philippine legislature rejected the terms of the 1933 Act, but the territory ultimately acquired independence under the 1934 Act.[18]

In the 1934 Act, Congress authorized the Philippine legislature to provide for the drafting, by elected delegates, of a constitution that met the Act's requirements. *Id*. §§ 1–2, 48 Stat. at 456–58. The Act required that the constitution be submitted for the President's review within two years of the Act's enactment. If the President certified that the constitution "conform[ed] substantially with the provisions of [the] Act," the constitution was to be submitted "to the people of the Philippine Islands for their ratification or rejection at an election to be held within four months after the date of such certification." *Id.* §§ 3–4, 48 Stat. at 458. Under the Act, a majority vote in favor of the constitution was to be "deemed an expression of the will of the people of the Philippine Islands in favor of Philippine independence." *Id.* § 4. Following ratification of such a constitution, the Governor General of the territory was to provide for an election of officers under the new constitution, and upon certification of the results of this election, the President was required to "issue a proclamation announcing the results of the election." *Id.* § 4, 48 Stat. at 458–59. The Act provided that "upon the issuance of such proclamation by the President

---

[17] *See* Pub. L. No. 73-12, 748 Stat. 456 (1934) ("1934 Act") (codified as amended at 22 U.S.C. §§ 1391–1395 (2006)); Pub. L. No. 72-311, 47 Stat. 761 (1933) ("1933 Act"); *Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 674–76 (1945) (discussing history of congressional enactments relating to government of the Philippines), *overruled on other grounds by Limbach v. Hooven & Allison Co.*, 466 U.S. 353 (1984).

[18] *See generally Evatt*, 324 U.S. at 675–76; *Valmonte v. INS*, 136 F.3d 914, 916–17 (2d Cir. 1998); *Rabang v. INS*, 35 F.3d 1449, 1451 (9th Cir. 1994); Arnold H. Leibowitz, *Defining Status: A Comprehensive Analysis of United States Territorial Relations* 54 (1989).

the existing Philippine government shall terminate and the new govern-ment shall enter upon its rights, privileges, powers, and duties, as provid-ed under the constitution." *Id.* The Act required the President to issue a further proclamation surrendering United States control of the territory and recognizing Philippine independence on July Fourth, ten years after the inauguration of this new government. *Id.* § 10, 48 Stat. at 463; *see also* J. Res. of June 29, 1944, § 3, 58 Stat. 625, 626 (authorizing the President "to advance the date of the independence of the Philippine Islands by proclaiming their independence as a separate and self-governing nation prior to July 4, 1946").

In accordance with the terms of this Act, President Roosevelt recog-nized, by proclamation effective November 15, 1935, the formation of a new constitutional government for the Philippines. On July 4, 1946, President Truman proclaimed the independence of the Philippines. *See* Proclamation No. 2148, 49 Stat. 3481 (1935); Proclamation No. 2695, 3 C.F.R. 86, 86 (1946), *reprinted in* 60 Stat. 1352 (1946), *and in* 22 U.S.C. § 1394 note (2006).

More recently, the United States altered its political relationship with Palau through legislation that conditioned the change on a vote by the territorial electorate. After World War II, Palau became part of a "trust territory" of the United States under the United Nations Charter. *See, e.g.*, *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*, 924 F.2d 1237, 1237–40 (2d Cir. 1991). In the 1980s, the United States negotiated a "Compact of Free Association" with the territory, according to which Palau would become a sovereign republic while maintaining extensive ties with the United States. *See* Compact of Free Association, Pub. L. No. 99-658, § 201, 100 Stat. 3672, 3678–79 (1986); *see generally* Stanley K. Laughlin, Jr., *The Law of United States Territories and Affiliated Juris-dictions* 461–78 (1995) ("Laughlin"). The compact provided that it would take effect only upon approval by the United States and Palau govern-ments according to each government's constitutional processes, and approval by Palau's voters in a plebiscite. *See* Compact of Free Associa-tion § 411, 100 Stat. at 3698.

Congress initially approved this compact in a 1986 statute that re-quired enactment of a further joint resolution before the compact could take effect. Pub. L. No. 99-658, § 101(a), (d)(1)(B), 100 Stat. at 3673, 3674. But in 1989, Congress passed a second statute authorizing "entry into force" of the compact, following a specified period of notice to

Congress, "subject to the condition that the Compact, as approved by the Congress in [the first statute], is approved by the requisite percentage of votes cast in a referendum conducted pursuant to the Constitution of Palau, and such approval is free from any legal challenge." Pub. L. No. 101-219, § 101, 103 Stat. 1870, 1870 (1989).[19] Palau voters approved the compact by plebiscite on November 9, 1993, and on September 27, 1994, President Clinton issued a proclamation deeming the compact effective as of October 1, 1994. The proclamation declared that "Palau will thereafter be self-governing and no longer subject to [United States] Trusteeship." Proclamation No. 6726, 3 C.F.R. 104, 105 (1994), *reprinted in* 108 Stat. 5631, 5632 (1994). Palau thus gained full independence under legislation that authorized the change in status upon the occurrence of a future contingency—voter approval in a plebiscite—without further action by Congress.[20]

Even Puerto Rico itself previously has undergone a significant change in its political relationship with the United States as a result of self-executing contingent legislation. In 1950, in Public Law 81-600, Congress established a process through which Puerto Rico's voters could adopt a constitution for the local government of the territory. The statute, however, made the drafting of a new constitution contingent upon approval of the Act's terms by a majority of voters participating in "an island-wide referendum to be held in accordance with the laws of Puerto Rico." *Id.* § 2, 64 Stat. at 319. Moreover, Public Law 81-600 provided that a constitution drafted and approved in accordance with the Act's procedures would "become effective" only "[u]pon approval by the Congress," *id.*

---

[19] The Palau Supreme Court ruled initially that a provision in Palau's constitution regarding nuclear materials on the island necessitated seventy-five percent approval for ratification of the compact, a decision that resulted in several failed votes to ratify the compact. Palau's constitution was eventually amended to allow approval of the compact by majority vote. *See* Chimene I. Keitner & W. Michael Reisman, *Free Association: The United States Experience*, 39 Tex. Int'l L.J. 1, 50–51 (2003); Laughlin at 98–100, 477–78.

[20] Two other states formed from the Trust Territory of the Pacific Islands—the Republic of the Marshall Islands and the Federated States of Micronesia—also entered into compacts of free association with the United States. These territories, however, approved the compacts in plebiscites prior to approval of the compacts by Congress. *See* Proclamation No. 5564, 51 Fed. Reg. 40,399 (Nov. 3, 1986) (describing plebiscite in Federated States of Micronesia on June 21, 1983, and in the Marshall Islands on September 7, 1983), *reprinted in* 48 U.S.C. § 1801 note (2006); Pub. L. No. 99-239, 99 Stat. 1770 (1986) (providing congressional approval of compacts for these territories).

§ 3, 64 Stat. at 319, and Congress ultimately provided such approval only in further contingent legislation. Specifically, in 1952, Congress approved a locally adopted constitution for Puerto Rico, but provided that certain provisions would have "no force and effect" until specified amendments were adopted "by the people of Puerto Rico." Congress also provided that the constitution as a whole would "become effective" only "when the Constitutional Convention [that drafted the constitution] shall have de-clared in a formal resolution its acceptance in the name of the people of Puerto Rico of the conditions of approval herein contained, and when the Governor of Puerto Rico, being duly notified by the proper officials of the Constitutional Convention of Puerto Rico that such resolution of ac-ceptance has been formally adopted, shall issue a proclamation to that effect." Pub. L. No. 82-447, 66 Stat. at 327–28. In accordance with the terms of this statute, the Puerto Rican Constitutional Convention adopted the required resolution, and the Governor of Puerto Rico deemed the constitution effective in a proclamation issued on July 25, 1952.[21]

Considered in combination with Congress's longstanding and repeated use of contingent legislation to admit territories as states, these examples of the Philippines' and Palau's transitions to independence and Puerto Rico's acquisition of commonwealth status present a powerful historical case for the permissibility of legislation that authorizes an alteration of Puerto Rico's status as triggered by a vote of the Puerto Rican electorate. *See, e.g., Mistretta v. United States*, 488 U.S. 361, 401 (1989) ("'tradi-tional ways of conducting government . . . give meaning' to the Constitu-tion") (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)); *The Pocket Veto Case,* 279 U.S. 655, 689 (1929) ("[l]ong settled and established practice is a con-sideration of great weight" in constitutional interpretation); *Whether Uruguay Round Agreements Required Ratification as a Treaty*, 18 Op. O.L.C. 232, 233 (1994) ("a significant guide to the interpretation of the Constitution's requirements is the practical construction placed on it by the executive and legislative branches acting together").

---

[21] *See* 48 U.S.C. § 731d note (2006); Resolution 34, Constitutional Convention of Puerto Rico (July 10, 1952), *reprinted in Documents on the Constitutional History of Puerto Rico* 196–97 (Office of the Commonwealth of Puerto Rico ed., 2d ed. 1964); *Establishment of the Commonwealth of Puerto Rico*, Proclamation by the Governor of Puerto Rico (July 25, 1952), *reprinted in Documents on the Constitutional History of Puerto Rico* at 198.

## III.

In accord with the analysis offered above, this Office and the Department of Justice have indicated on many occasions that Congress may provide for a change in Puerto Rico's status, contingent upon actions by the Puerto Rican electorate, without the need for subsequent congressional action.

In 1959, this Office reviewed a bill that would have provided for admission of Puerto Rico as a State upon presidential proclamation, without further congressional action, following ratification of a state constitution and election of congressional representatives by Puerto Rico voters. *See* Memorandum for Lawrence E. Walsh, Deputy Attorney General, from Robert Kramer, Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 7003, 86th Cong., 1st Sess., a bill "To provide for a referendum in Puerto Rico on the admission of Puerto Rico into the Union as a State, and to establish the procedure for such admission if the people of Puerto Rico desire it"* (Oct. 12, 1959) ("Kramer Memo"); H.R. 7003, 86th Cong. § 206(a) (as introduced in House, May 7, 1959). We questioned the propriety of "using this procedure in the case of Puerto Rico," because it would have provided for admission of Puerto Rico without prior congressional review of the state constitution to be adopted by the territory, thus reducing congressional "control" over the procedure. But we expressed no uncertainty about the constitutional permissibility of the procedure in the bill. On the contrary, we noted that it was "patterned upon one of the methods frequently used to admit states to the Union" and that "a great many territories [had] secured admission as the result of a single act passed by the Congress" establishing similar preconditions. Kramer Memo at 2, 3.

Thirty years later, our Office provided advice regarding "the general legal requirements for admitting Puerto Rico to the Union." Memorandum for Thomas M. Boyd, Assistant Attorney General, Office of Legislative Affairs, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Statehood for Puerto Rico* at 1 (Mar. 3, 1989). Explaining that "Congress has employed a variety of methods to admit new States into the Union," we gave a summary description of some of the types of contingent legislation Congress has used to grant statehood, including making admission effective upon the results of a

territorial vote following adoption of a constitution. "Congress . . . may set conditions for a territory to meet before it becomes a state," we explained, so long as the conditions do not "violate some other textual provision of the Constitution or . . . interfere with essential aspects of state sovereignty, such as dictating the location of the state capital." *Id.*[22]

In the same year, this Office and the Department commented on S. 712, a bill that would have provided for self-executing changes in Puerto Rico's status based on the results of a plebiscite.[23] Although the Department expressed concerns about other aspects of the bill, including concerns related to the proposed referendum process, it did not suggest that Congress lacked authority to provide for a change in Puerto Rico's political relationship with the United States contingent on a referendum in Puerto Rico.[24] On the contrary, the Acting Deputy Attorney General stated in testimony that "[t]he Administration strongly supports the right of the people of Puerto Rico to choose their political status by means of a referendum," and that "the referendum can present options that, if select-

---

[22] The Supreme Court has found the so-called "equal footing" doctrine implicit in the terms "State" and "Union" in the provisions governing admission of States. According to the doctrine, all states in the Union must stand on terms of "constitutional equality" with all other states regardless of when they were admitted, and Congress, therefore, may not "deprive[]" a new state of "any of the power constitutionally possessed by other States." *Coyle v. Smith*, 221 U.S. 559, 570, 580 (1911); *see also, e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 203–04 (1999). At the same time, the Court has recognized that Congress "may require, under penalty of denying admission," that a territory seeking admission as a State satisfy certain conditions before being admitted to the Union. *Coyle*, 221 U.S. at 568.

[23] *See* Memorandum for Edith E. Holiday, General Counsel, Department of Treasury, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: S. 712 Puerto Rico Status* (July 6, 1989); *see also* S. 712, 101st Cong. (as introduced in Senate, Apr. 5, 1989); S. 712, 101st Cong. (as ordered reported by Senate Committee on Energy and Natural Resources, Sept. 6, 1989); S. Rep. No. 101-481 (1990) (report of Senate Finance Committee); S. Rep. No. 101-120 (1989) (report of Senate Energy and Natural Resources Committee).

[24] *See, e.g.*, *Puerto Rico's Political Status: Hearing on S. 712 Before the S. Comm. on Finance*, S. Hrg. No. 101-557, pt. 1, at 6 (1989) (statement of Shirley D. Peterson, Assistant Attorney General, Tax Division); *Political Status of Puerto Rico: Hearings on S. 710, 711, and 712 Before the S. Comm. on Energy & Nat. Resources*, S. Hrg. No. 101-198, pt. 3, at 13 (1989) (statement of Edward S.G. Dennis, Acting Deputy Attorney General).

ed by a majority of the voters in Puerto Rico, *can immediately be implemented*."[25]

In the following Congress, the Attorney General raised concerns about legislation similar to S. 712 that was *not* self-executing, but rather called for specified House and Senate Committee Chairmen to introduce legislation, with terms prescribed by the bill, that would have enacted a particular outcome upon approval by voters in Puerto Rico through a referendum. *See* S. 244, 102d Cong. § 101(e)–(f) (as introduced in Senate, Jan. 23, 1991). Attorney General Thornburgh observed that, "[i]f Congress intends to truly *commit* itself to implement whatever status option receives a majority in accordance with [the bill], *it should return to the self-executing approach and language of S. 712*." *Political Status of Puerto Rico: Hearings on S. 244, to Provide for a Referendum on the Political Status of Puerto Rico Before the S. Comm. on Energy & Nat. Resources*, 102d Cong. 195 (1991) (prepared statement by Attorney General Richard Thornburgh) (second emphasis added); *see also* H.R. 4765, 101st Cong. (as passed by House, Oct. 10, 1990); H.R. Rep. No. 101-790, pts. 1 & 2 (1990).

These past statements by the Justice Department provide further support for the constitutionality of legislation conditioning a self-executing change in Puerto Rico's political relationship with the United States on the results of a referendum in Puerto Rico.

## IV.

In light of the permissibility of contingent legislation and the numerous historical precedents for legislation that conditions both statehood and independence on votes by territorial electorates without the need for subsequent congressional action, we think it clear that Congress may provide that a change in Puerto Rico's political relationship with the United States will take effect upon approval of the change by Puerto Rico's voters.

---

[25] S. Hrg. No. 101-198, *supra* note 24, pt. 3, at 22 (statement of Edward S.G. Dennis, Acting Deputy Attorney General) (emphasis added); *see also id.* at 13 (testimony of Edward S.G. Dennis, Acting Deputy Attorney General) ("the President is very much in favor of the approach of having the referendum process be one through legislation that would be self-executing").

We recognize that the legislation currently being contemplated, like some of the prior bills concerning Puerto Rico's status discussed in Part III, may provide voters in Puerto Rico with more than two status options from which to choose; the legislation might include statehood, independence, and a modified commonwealth relationship as alternatives. *See, e.g.*, S. 712, 101st Cong. § 2 (as introduced in Senate, Apr. 5, 1989) (providing for options of "statehood," "independence," or "commonwealth" to take effect, in accordance with terms and procedures set forth in the bill, following approval by a majority of voters in an initial referendum or runoff referendum). In this respect, the legislation would depart from the historical practice we have reviewed, where contingent legislation provided territorial voters with only two status options. This divergence might form the basis of an argument that a referendum offering voters more than two status options would cross a constitutional line by impermissibly delegating Congress's authority to territorial voters.

In our judgment, however, this potential, limited divergence from historical practice is immaterial to our constitutional analysis. Congress historically has offered to territorial electorates two choices—statehood (or in some cases independence) on the one hand, and continued territorial status on the other—each of which was acceptable to Congress, and each of which came with different legal and policy implications. Congress thus has given territorial electorates ultimate control over whether their territories have become states (or occupied some other status), as would be the case with a referendum that offered Puerto Rico voters three choices. As we note above, *see supra* note 6 and accompanying text, Congress may enact legislation conditioning the effectiveness of a law on approval by affected parties.[26] In our view, as long as Congress offered Puerto Rico voters a limited range of options specified in advance, it would make no meaningful constitutional difference whether those options numbered two

---

[26] The outcome of voting on referenda that specify a limited set of options remains simply a "condition[]" that Congress has "exercise[d] its legislative authority" to "prescribe[e] [as] the condition[] of [the statute's] application." *Currin*, 306 U.S. at 16; *see also Clinton v. City of New York*, 524 U.S. 417, 443–44 (1998) (indicating the permissibility of legislation that makes specified results "contingent upon a condition that did not exist when the [statute] was passed," requires executive officials to effectuate that result upon occurrence of the contingency, and provides for execution of a "policy that Congress had embodied in the statute").

or three, and the process for resolving Puerto Rico's status would not present delegation concerns. We therefore conclude that the present proposals for referenda would be lawful.

CRISTINA M. RODRÍGUEZ
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
